**F I L E D**
United States Court of Appeals
Tenth Circuit

OCT 28 1998

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

PHILADELFIO C. ARMIJO, a
deceased minor, by and through his
mother/father and next friends,
JUANITA D. CHAVEZ and
ATANACIO ARMIJO,

      Plaintiffs-Appellees-Cross-
      Appellants,

v.

WAGON MOUND PUBLIC
SCHOOLS; WAGON MOUND
PUBLIC SCHOOL BOARD, BOB
BACHEN, Chairman, J.D. SCHMIDT,
Vice-Chairman, DON SCHULTZ,
Secretary, ELDIE CRUZ and
HERMAN FERNANDEZ, Members;
TONY GARCIA, Superintendent;
MARY SCHUTZ, Principal; TOM
HERRERA, Counselor; and PAM C.
CLOUTHIER, Educational Aide; all of
the above individually and in his/her
official capacity,

      Defendants-Appellants-Cross-
      Appellees.

Nos. 97-2150, 97-2167

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-95-1519-M/LCS)**

---

Kevin M. Brown, Brown & German, Albuquerque, New Mexico, for appellants/cross-appellees.

Adam G. Kurtz (Joe M. Romero, Jr. with him on the briefs), Romero & Associates, Albuquerque, New Mexico, for appellees/cross-appellants.

---

Before **EBEL**, **HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

After being suspended and driven home without parental notification, a special education student at a public school committed suicide. His parents brought a cause of action against the school district and various school officials alleging violation of their deceased son's civil rights. The district court denied the defendants' motion for summary judgment on the issue of qualified immunity. Defendants now appeal. Plaintiffs cross-appeal the district court's grant of summary judgment against them on some of their claims. We affirm in part, reverse in part, and remand.

## BACKGROUND

In 1994, Philadelfio C. Armijo ("Armijo") was a sixteen-year-old special education student at Wagon Mound Public Schools ("WMPS"), in Wagon Mound, New Mexico.[1] Armijo is represented in this action by Juanita D. Chavez and

---

[1] For purposes of this appeal, we consider the facts in a light most

(continued...)

Atanacio Armijo (the "Plaintiffs"), his mother and father and next friends. Armijo was classified as learning disabled, and had other psychological and emotional problems, including impulsivity and depression. Armijo had been a special education student at WMPS for seven years. WMPS charted Armijo's progress as a special education student through Individual Education Plans ("IEP") that school officials developed for him.

The October 6, 1994, IEP notes for Armijo stated that "Phil will see [a] social worker for assistance with dealing with school and self-esteem." Earlier in the year, Armijo had told school aide Pam Clouthier ("Clouthier"), "maybe I'd be better off dead." In a discussion with Clouthier in 1994, Armijo stated "I'm just going to shoot myself." Both Clouthier and school counselor Tom Herrera ("Herrera") knew that Armijo had access to firearms.

On December 1, 1994, Principal Mary Schutz ("Schutz") verbally reprimanded Armijo for harassing an elementary student. While in the presence of Schutz and Herrera, Armijo threatened physical harm to the teacher that reported the incident, to the teacher's son, and to the teacher's car. Schutz immediately suspended Armijo on an emergency basis. Schutz considered Armijo to be at risk for committing violence. Schutz instructed Herrera to drive Armijo

[1](...continued)
favorable to Plaintiffs.

home, which he did. Schutz also contacted the police to inform them of the suspension and instructed the police to detain Armijo if they saw him returning to school. On the way to Armijo's house, Herrera observed Armijo to be "very angry."

Schutz did not follow stated school disciplinary policy by sending Armijo home. The WMPS policy allows for "[t]emporary suspensions of students who are eligible for special education services . . . in accordance with the normal procedures . . . provided that the student is returned to the same educational placement after the temporary suspension." However, the WMPS Parent/Student Handbook provides, "If a student is placed on out-of-school suspension, but his/her parents will not be home, that student will be placed instead on in-school suspension without credit for work done."[2] Schutz did not inform Armijo's parents about his emergency removal from the school. Schutz also did not instruct Herrera to notify Armijo's parents. Nor did Schutz tell Herrera to check if Armijo's parents were home or to bring him back to school if no one was home.

---

[2] WMPS policy also allows: "Students whose presence poses a continuing danger to persons or property or an ongoing threat of interfering with the educational process may be immediately removed from school . . . ." Under the policy, "' immediate removal' means the removal of a student from school for one school day or less under emergency conditions and without a prior hearing." However, taking the evidence in the light most favorable to Plaintiffs, the non-moving party, we assume that the suspension violated school policy because Armijo was sent home when neither parent was at home.

Although Herrera knew that he should speak with Armijo's parents about their son's suspension, Herrera did not attempt to contact them.

After arriving at Armijo's house, Armijo got out of Herrera's car and ran around to the back of the house as Herrera drove away. Armijo's parents returned home later that day and found their son in their bedroom dead of a self-inflicted gunshot wound to the chest from a rifle. In her hand-written statement to the Wagon Mound Police made immediately after learning of Armijo's death, Clouthier noted that within the last months before his death "Phil [Armijo] was constantly depressed and nervous and not really knowing who or what he was." Clouthier added that earlier that day, while discussing Armijo's misbehavior and his inability to understand why he was in trouble, "Phil then told me that maybe he should just leave the school and go to Colorado. I replied, 'mi hijo relax your [sic] upset but everything will be okay.['] He then said I don't know Pam, maybe I'd be better off dead."

Plaintiffs filed a complaint against WMPS, the WMPS School Board, WMPS Superintendent Tony Garcia, Schutz, Herrera, and Clouthier ("Defendants") under the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and under 42 U.S.C. § 1983.[3] Plaintiffs claimed that the

_____

[3] Plaintiffs also filed a claim under the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-6 (1989). The district court dismissed that claim and Armijo

(continued...)

WMPS Defendants violated IDEA and that the violation caused Armijo's death. Plaintiffs also alleged that WMPS, the WMPS School Board, and WMPS Superintendent Garcia ("WMPS Defendants") improperly failed to train school officials to handle situations involving potentially violent and suicidal students such as Armijo, in violation of 42 U.S.C. § 1983. Finally, Plaintiffs brought a cause of action under 42 U.S.C. § 1983 against Schutz, Herrera, and Clouthier (the "Individual Defendants"), alleging that they violated Armijo's substantive due process rights.

In an April 15, 1997, Memorandum Opinion and Order ("Order"), the district court granted the WMPS Defendants' motion for summary judgment on the IDEA claim and the § 1983 failure to train claim. The district court denied the Individual Defendants' motion for summary judgment based on qualified immunity from the § 1983 substantive due process claim. The district court found that Plaintiffs presented a triable issue regarding Defendants' knowledge of the danger of suicide and the reasonableness of sending Armijo home without parental notification in light of that risk. Holding that "danger creation" jurisprudence was clearly established well before Armijo committed suicide, the district court found that Plaintiffs' allegations stated a cause of action under the

_____

[3](...continued)
does not appeal the district court's ruling on the issue.

danger creation theory of liability. The district court also found that "the precise measure of state restraint that engenders an individual's right to claim a corresponding affirmative duty" by the state to protect that individual from harm is not defined. However, the district court went on to state that Plaintiffs presented sufficient facts to create a genuine dispute as to whether the Defendants had a "special relationship" with Armijo which gave rise to a corresponding duty to protect him from injury.

In Case No. 97-2150, Defendants filed an interlocutory Notice of Appeal of the district court's denial of qualified immunity. Plaintiffs contest the appeal for lack of jurisdiction. In the alternative, in Case No. 97-2167, Plaintiffs cross-appeal the district court's grant of summary judgment on the failure to train and IDEA claims.

## DISCUSSION

### I. Jurisdiction

We determine whether a defendant may bring an interlocutory appeal of the denial of summary judgment on the issue of qualified immunity under the standard set forth in Johnson v. Jones, 515 U.S. 304 (1995), and Behrens v. Pelletier, 516 U.S. 299 (1996). We recently stated that, under Johnson, "[o]rders denying qualified immunity before trial are appealable to the extent they resolve

abstract issues of law." Clanton v. Cooper, 129 F.3d 1147, 1152 (10th Cir. 1997).

Thus:

> a district court's order denying a defendant's motion for summary judgment [is] an immediately appealable "collateral order" (i.e., a "final decision") . . . where (1) the defendant [is] a public official asserting a defense of "qualified immunity" and (2) the issue appealed concern[s] not which facts the parties might be able to prove, but, rather, whether or not certain given facts show[ ]a violation of "clearly established" law.

Johnson, 515 U.S. at 311 (citing Mitchell v. Forsyth, 472 U.S. 511, 528 (1985)).

However, denial of summary judgment is not reviewable as a collateral order "[t]o the extent that the district court's denial of the defendant's motion for summary judgment is predicated on 'evidence sufficiency,' i.e. which facts a party may, or may not, be able to prove at trial." Clanton, 129 F.3d at 1152 (quoting Johnson, 515 U.S. at 313). "Rather, 'immunity appeals . . . [are] limited to cases presenting neat abstract issues of law.'" Clanton, 129 F.3d at 1153 (quoting Johnson, 515 U.S. at 317).

In Foote v. Spiegel, 118 F.3d 1416 (10th Cir. 1997), we stated:

> A determination that the law allegedly violated by the defendant was clearly established at the time of the challenged actions is an abstract issue of law that is immediately appealable. A determination that under either party's version of the facts the defendant violated clearly established law is also immediately appealable. However, government officials cannot appeal pretrial denial of qualified immunity to the extent the district court's order decides nothing more than whether the evidence could support a finding that particular conduct occurred. An order denying qualified immunity on summary judgment is not appealable if it merely determines the facts asserted

by the plaintiff are sufficiently supported by evidence in the record to survive summary judgment.

Id. at 1422 (internal citations omitted); see also Wilson v. Meeks, 98 F.3d 1247, 1250-51 (10th Cir. 1996) (surveying Tenth Circuit cases interpreting Johnson); Mick v. Brewer, 76 F.3d 1127, 1133 (10th Cir. 1996) (dismissing part of defendants' appeal after finding jurisdiction to review district court's legal determination of what constituted clearly established law, but finding no jurisdiction to review district court's ruling that genuine issues of material fact precluded summary judgment).

The district court found "a genuine dispute of fact as to whether defendants knew that Philadelfio was suicidal and thus able to care for himself when he was suspended from school and driven to his home where he was left alone without parental notification." Plaintiffs argue that we do not have jurisdiction over the appeal because the district court denied summary judgment after finding a dispute of fact regarding whether the Individual Defendants knew that Armijo was suicidal and thus would unreasonably be placed at risk of harm if he were removed from school and left alone at home without parental notification. Defendants argue that there is no material dispute of fact as to whether they knew that Armijo was suicidal because Clouthier did not take Armijo's suicidal statements seriously, Clouthier now does not recall Armijo making any of the statements she related in her affidavit to the police, Clouthier was not involved in

- 9 -

Armijo's suspension decision, and Armijo did not make suicidal threats to either Schutz or Herrera.  Defendants also claim that their appeal involves the purely abstract legal question of whether Armijo's federal rights allegedly infringed were "clearly established."

We have jurisdiction to consider the appeal, but only over the legal issues raised in the case.  We do not have jurisdiction to review the district court's factual findings, including its finding that a genuine dispute of fact existed as to the school's knowledge of Armijo's suicide risk and his ability to care for himself.  In considering the legal issues:

> [We] review whether, under [plaintiff's] version of the facts, [defendant] violated clearly established law.  In making this determination, we must scrupulously avoid second-guessing the district court's determinations regarding whether [plaintiff] has presented evidence sufficient to survive summary judgment.  Rather, we review only whether [defendant's] conduct, as alleged by [plaintiff], violated clearly established law.

Clanton, 129 F.3d at 1153 (internal citation omitted).

However, if the district court does not "identify the particular charged conduct that it deemed adequately supported" by the evidence, "'a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court . . . likely assumed.'"  Behrens, 516 U.S. at 313 (quoting Johnson, 515 U.S. at 319).  Thus, if the district court concludes that a genuine issue of material fact exists in denying qualified immunity, but does not

- 10 -

set forth with specificity the facts presented by the plaintiff that support a finding that the defendant violated a clearly established right, then we may look behind the order denying summary judgment. In such circumstances, but only in such circumstances, we may review the entire record, construing the evidence in the light most favorable to the plaintiff, and determine de novo whether the plaintiff in fact presented sufficient evidence to forestall summary judgment on the issue of qualified immunity. Conversely, where the district court makes a legal finding and states specific facts upon which that finding is based, we do not have jurisdiction to delve behind the ruling and review the record to determine if the district court correctly interpreted those facts to find a genuine dispute.

Here, the district court found that Plaintiffs presented a dispute of fact regarding whether Defendants knew that Armijo was suicidal and could not care for himself. As a result, we do not have jurisdiction to consider Defendants' argument that there is no material dispute of fact as to those issues. Even if the district court erred in reaching that finding, we would not have jurisdiction to review that fact-based determination on an interlocutory appeal. See Myers v. Oklahoma County Bd. of County Comm'rs, 80 F.3d 421, 424-25 (10th Cir.) (no jurisdiction to hear an appeal when "the district court denied summary judgment to the individual defendants on their qualified immunity defense on the sole basis that there was a genuine issue for trial regarding the reasonableness of

defendants' conduct.") (internal quotations and citations omitted), <u>cert. denied</u> <u>sub nom.</u> <u>Sharp v. Myers</u>, 117 S. Ct. 383 (1996).

However, because the district court did not identify any other specific facts in support of its conclusion that summary judgment was inappropriate, we will review the record in the light most favorable to Plaintiffs on all other factual questions in considering Defendant's appeal. Thus, we address de novo Defendants' claim that no violation of any clearly established law occurred even taking Plaintiffs' allegations regarding those facts as true, where those allegations have some record support. <u>See</u> <u>Clanton</u>, 129 F.3d at 1153.[4]

## II. Qualified Immunity

"State government officials performing discretionary functions enjoy qualified immunity from liability under 42 U.S.C. § 1983." <u>Clanton</u>, 129 F.3d at 1153. "Such immunity is qualified in that it does not obtain when otherwise immune officials violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Id.</u> In this case, Plaintiffs claim that the Due Process Clause of the Fourteenth Amendment imposed upon the

---

[4] The parties also briefed the question of jurisdiction over the issue of qualified immunity as to the WMPS Defendants. However, Defendants did not move below for summary judgment on qualified immunity for the WMPS Defendants nor did the district court rule on this issue. Consequently, we need not address this issue on appeal.

Individual Defendants a clearly established duty to protect Armijo from his self-inflicted death.

In Clanton, we articulated the Tenth Circuit's framework for analyzing a question of qualified immunity in a § 1983 claim:

> In analyzing qualified immunity claims, we first ask if a plaintiff has asserted the violation of a constitutional right at all, and then assess whether that right was clearly established at the time of a defendant's actions. Once a public official raises a qualified immunity defense, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's conduct violated the law; and (2) demonstrating that the relevant law was clearly established when the alleged violation occurred.

Id. (quoting Gehl Group v. Koby, 63 F.3d 1528, 1533 (10th Cir. 1995) (quotations and internal citations omitted).

In showing that the law was clearly established, the plaintiff does not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law. See id. at 1154. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (quotations omitted). "[I]t is the plaintiff's burden to establish the asserted right's contours are sufficiently clear such that a reasonable official would understand that what he is doing violates that right." Id. at 1156 (quotations omitted). The plaintiff may satisfy his or her burden by showing that there is a Supreme Court or Tenth Circuit opinion on point, or that his or her proposition is

- 13 -

supported by the weight of authority from other courts.  Id.  However, we do not

require plaintiffs to produce a factually identical case, but allow some degree of

generality in factual correspondence.  See id. at 1156-57.

Generally, state actors are liable only for their own acts, and not the violent

acts of third parties.  See Liebson v. New Mexico Corrections Dep't, 73 F.3d 274,

276 (10th Cir. 1996).  However, there are two exceptions to this general rule:

> The first exception, known as the special relationship doctrine,
> "exists when the state assumes control over an individual sufficient
> to trigger an affirmative duty to provide protection to that
> individual. . . ."  The second exception, sometimes referred to as the
> "danger creation" theory, provides that a state may also be liable for
> an individual's safety "if it created the danger that harmed the
> individual."

Id. (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995), and DeShaney v.

Winnebago County Dep't of Social Servs., 489 U.S. 189, 199-200 (1989)).

### a.  Special Relationship

A state is not required to provide its citizens with "particular protective

services" under the Due Process Clause, and "failure to protect an individual

against private violence simply does not constitute a violation of the Due Process

Clause."  DeShaney, 489 U.S. at 197.  However, if the state restrains an

individual's freedom to act to protect himself or herself through a restraint on that

individual's personal liberty, the state may thereby enter into a "special

relationship" during such restraint to protect that individual from violent acts inflicted by others.

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-- through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

Id. at 200; see also City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239 (1983) (duty to provide medical care to injured suspects in police custody); Youngberg v. Romeo, 457 U.S. 307 (1982) (duty to protect involuntarily committed mental patients from harm by themselves and others). This court has held that a plaintiff must show involuntary restraint by the government official in order to establish a duty to protect under the special relationship theory. See Liebson, 73 F.3d at 276 (holding that a librarian who was sexually assaulted while working in a prison failed to show the existence of a special relationship because her employment was voluntary).

> We have applied this principle in the context of a claim that a school district had a duty to protect a student from his fellow students. In Graham v. Independent Sch. Dist. No. I-89, 22 F.3d 991, 994-95 (10th Cir. 1994), we held that schools have no duty under the Due Process Clause to protect students from assaults by other students, even where the school knew or should have known of the danger presented. If the state takes a person into custody or holds him against his will, the state assumes some measure of a constitutionally mandated duty of protection. Id. at 994. Compulsory attendance laws for public schools, however, do not create an affirmative constitutional duty to protect students from the private actions of

- 15 -

third parties while they attend school. Id. (citing Maldonado v. Josey, 975 F.2d 727, 732 (10th Cir. 1992), cert. denied, 507 U.S. 914, 113 S. Ct. 1266, 122 L.Ed.2d 662 (1993)). Inaction by the state, in the face of a known danger, is not enough to trigger a constitutional duty to protect unless the state has a custodial or other "special relationship" with the victim. See Graham, 22 F.3d at 995. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney, 489 U.S. at 200, 109 S. Ct. at 1005-06.

Seamons v. Snow, 84 F.3d 1226, 1235-36 (10th Cir. 1996).

The district court made no findings of specific facts that would support a special relationship theory of liability. Thus, we may review the record to determine what facts the district court likely assumed. See Behrens, 516 U.S. at 313. At most, Armijo was a student in a public school confined in Herrera's car during the drive home from school. Even if such circumstances constituted a custodial relationship, that relationship ended once Armijo exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official. The only "restraint" imposed upon Armijo after his removal from school was Schutz' directive that he not return to school that day. Otherwise, Armijo was free to do whatever he wanted, including voluntarily leaving his house. Banning a student from the school grounds does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual. The fact that Armijo ended his life after he was "released" by

Herrera bars any liability under the special relationship doctrine.[5]  Thus, the district court erred as a matter of law by denying qualified immunity to the Individual Defendants on the special relationship claim.

### b.  Danger Creation

As noted above, the district court found that Plaintiffs presented sufficient evidence to create a dispute over whether the Individual Defendants generally knew that Armijo was suicidal and knew that removing him from school and leaving him home alone could unreasonably create a risk of harm.  Thus, we do not have jurisdiction to review the sufficiency of the factual basis supporting these specific findings by the district court.  See Clanton, 129 F.3d at 1153.  However, the district court nowhere made findings as to whether there were facts creating a dispute as to whether each of these Individual Defendants in fact did anything to cause the danger that arguably cost Armijo his life.  On the issue of actual danger creation, all the district court did was to issue the conclusory legal ruling that "Plaintiffs allege sufficient facts pointing to affirmative actions taken by defendants that created or increased the danger to Philadelfio Armijo"

---

[5]  Defendants' knowledge of the risk of harm to Armijo is not relevant to the determination of whether a special relationship existed.  See Graham v. Independent Sch. Dist. No. I-89, 22 F.3d 991, 994 (10th Cir. 1994) ("foreseeability cannot create an affirmative duty to protect" under the special relationship doctrine "when plaintiff remains unable to allege a custodial relationship").

- 17 -

(emphasis added). This statement by the court, however, is only a generalized statement of what constitutes sufficient allegations, as a matter of law, to state a danger creation cause of action. It does not constitute findings of fact, nor even a finding that particular material facts were in dispute. Thus, we are free to examine the record to see what evidence, if any, the district court may have been relying on in denying summary judgment on the ground that these Individual Defendants created the danger that arguably cost Armijo his life.

First, however, we must determine whether the district court was correct in determining that danger creation jurisprudence was clearly established as a matter of law at the time of the conduct here at issue. On this issue we agree with the district court that the law was clearly established.

"[S]tate officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." Seamons, 84 F.3d at 1236 (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995). In Uhlrig, we held that "the danger creation theory must ultimately rest on the specifics of a substantive due process claim – i.e. a claim predicated on reckless or intentional injury-causing state action which 'shocks the conscience.'" 64 F.3d at 572. In order to discern whether the facts of a particular case "shock the conscience" so as to support a substantive due process claim,

> we must bear in mind three basic principles highlighted by the
> Supreme Court . . .: (1) the need for restraint in defining [the] scope

- 18 -

[of substantive due process claims]; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

Id. at 573 (internal citations omitted). We held that to satisfy the "shock the conscience" standard, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Id. at 574. We declined to precisely define this level of conduct, but left it to evolve over time. See id. "We do know, however, that the 'shock the conscience' standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort . . . ." Id.

In Uhlrig, we articulated a five-part test to determine whether a defendant created a special danger for the plaintiff:

> Plaintiff must demonstrate that (1) [Plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [Plaintiff] . . . at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking.

Id. Although this five part test is correct, so far as it goes, it is not entirely complete in light of the Supreme Court's decision in DeShaney, 489 U.S. at 201. In DeShaney, the Court held that the State had not violated the Due Process Clause by returning a child to the custody of his abusive father, who then beat the

- 19 -

child and caused him permanent brain damage. Id. Although the plaintiff in that case arguably met the five criteria set forth in Uhlrig, the Supreme Court held that the plaintiff's § 1983 claim must fail. Specifically, the DeShaney Court stated:

> While the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. . . . [I]t placed him in no worse position than that in which he would have been had it not acted at all.

Id. Thus, in addition to meeting Uhlrig's five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way.[6] In other words, if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed.[7]

---

[6] Because the court in Uhlrig found that the plaintiff in that case did not meet the five requirements set forth in the opinion, see Uhlrig, 64 F.3d at 575-76, the court did not need to reach the question of the state's role in causing or enhancing the danger to the plaintiff. As a result, our holding is not inconsistent with the holding in Uhlrig or subsequent Tenth Circuit opinions relying on Uhlrig that also denied recovery because the plaintiff failed to meet Uhlrig's five-part test. See Seamons, 84 F.3d at 1236; Liebson, 73 F.3d at 276-77.

[7] Compare Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993) (allowing recovery for injury that resulted from police indication to "skinheads" that they would not interfere if "skinheads" beat up flag-burning protesters

(continued...)

The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur.

Johnson v. Dallas Ind. Sch. Dist., 38 F.3d 198, 201 (5th Cir. 1994) (internal citations and quotations omitted); see also Reed v. Gardner, 986 F.2d 1122, 1126 (7th Cir. 1993) (plaintiffs "may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been"); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990) (DeShaney "establishes the possibility that a constitutional duty to protect an individual

---

[7](...continued)
because "the defendant officers indeed had made the demonstrators more vulnerable to assaults"); Ross v. United States, 910 F.2d 1422, 1431 (7th Cir. 1990) (allowing recovery for injury resulting from state prevention of private rescue attempt); and Estate of Sinthasomphone v. City of Milwaukee, 785 F. Supp. 1343, 1349 (E.D. Wis. 1992) (city increased vulnerability of boy when its officers threatened to arrest private citizens who wanted to intervene to protect the boy and then sent the boy back naked to Jeffrey Dahmer); with Salas v. Carpenter, 980 F.2d 299, 309-10 (5th Cir. 1992) (no liability where city did not increase risk of harm to hostage by declining assistance from a SWAT team from another department and taking a hard line with hostage taker); Jackson v. City of Joliet, 715 F.2d 1200, 1204-1205 (7th Cir. 1983) (no liability where "state officers did not create but merely failed to avert danger" by not promptly rescuing victims from burning car); and Rogers v. City of Port Huron, 833 F. Supp. 1212, 1218-19 (E.D. Mich. 1993) (no liability where police did not increase danger to drunken man lying next to the road by refusing to assist him).

- 21 -

against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action.").

The particular facts found in dispute by the district court, in conjunction with the evidence culled from our review of the record on issues not specifically addressed by the district court,[8] were sufficient to raise factual inferences that could satisfy the five part test set forth in Uhlrig as to Individual Defendants Schutz and Herrera: (1) Armijo was a member of a limited and specifically definable group--special education students who have expressed threats of suicide, (2) Schutz' and Herrera's conduct put Armijo at substantial risk of serious, immediate and proximate harm by suspending him from school, which caused him to become distraught and to threaten violence, and then taking him to his home and leaving him alone with access to firearms, (3) they had some knowledge that might support an inference that Armijo was suicidal and distraught, was unable to care for himself, was home alone, and at least some of the Individual Defendants knew Armijo had access to firearms, (4) by taking this

---

[8] The district court made no findings on whether Plaintiffs presented evidence that the Individual Defendants knew that Armijo would be home alone or whether the school knew that the disciplinary action would worsen Armijo's situation. Thus, we can review the record for evidence on those issues. Taking the evidence in the light most favorable to Armijo, Plaintiffs did present genuine disputes of fact on those two factual questions.

- 22 -

action, knowing of Armijo's vulnerability and risks of being left alone at home, Schutz and Herrera acted recklessly in conscious disregard of the risk of suicide, and (5) such conduct, if true, when viewed in total, possibly could be construed as conscience-shocking, depending on context as determined after a full trial. In addition, these facts taken as true also could be construed to show (6) that Schutz and Herrera increased the risk of harm to Armijo. Thus, the district court properly denied summary judgment on this issue as to Schutz and Herrera.[9]

However, we reverse the district court's order denying summary judgment as to Defendant Clouthier. Clouthier was a school aide and there is nothing in this record to support a conclusion that Clouthier caused or created the danger that arguably led to Armijo's death. There is nothing in this record to suggest that Clouthier was involved in the decision to suspend Armijo or to send him home alone without adult supervision. In the absence of any evidence that Clouthier caused or created the danger, she was entitled to summary judgment. Behrens, 516 U.S. at 313.

---

[9] As pointed out above, we must draw all inferences in favor of Plaintiffs because this matter comes before us upon a denial of summary judgment for the Individual Defendants. It may be that, at trial, Plaintiffs will be unable to carry their burden of proof as to these Individual Defendants, and we cannot help but observe that the facts presently before us are very thin to establish a number of the six factors required for liability. However, given all inferences to Plaintiffs and accepting the unreviewability of the district court's factual findings pursuant to Johnson v. Jones, we must affirm the denial of summary judgment to Individual Defendants Schutz and Herrera.

## III. Cross-Appeal

In order to consider the cross-appeal, we must exercise pendent appellate jurisdiction. See Moore v. City of Wynnewood, 57 F.3d 924, 929 (10th Cir. 1995). Although discretionary, the exercise of pendent appellate jurisdiction "is generally disfavored." Id. In Swint v. Chambers County Comm'n, 514 U.S. 35, 50-51 (1995), the Supreme Court held that pendent appellate jurisdiction generally should not be exercised over otherwise interlocutory appeals. The Court stated that purely pragmatic considerations such as judicial economy would not support the exercise of pendent appellate jurisdiction because "a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay . . . collateral orders into multi-issue interlocutory appeal tickets." Id. at 49-50. However, this court has interpreted Swint as suggesting that "pendent appellate jurisdiction might still be appropriate where the otherwise nonappealable decision is 'inextricably intertwined' with the appealable decision, or where review of the nonappealable decision is 'necessary to ensure meaningful review' of the appealable one." Moore, 57 F.3d at 930 (quoting Swint, 514 U.S. at 51). "[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory

appeal – that is, where the appellate resolution of the collateral appeal <u>necessarily</u> resolves the pendent claim as well." <u>Id</u>.

Plaintiffs argue that <u>Moore</u> supports the exercise of pendent appellate jurisdiction in this case. This court in <u>Moore</u> chose to exercise pendent appellate jurisdiction over a municipality's appeal of the denial of summary judgment in its favor in conjunction with a city official's appeal of the denial of summary judgment on the issue of qualified immunity because resolving the issue of qualified immunity in favor of the city official completely resolved the claim against the municipality. <u>See</u> <u>Moore</u>, 57 F.3d at 930. As a result, the court in <u>Moore</u> found that the pendent claims were "coterminous with, or subsumed in," the claim appropriately before the court on interlocutory appeal. <u>Id.</u> However, the court in <u>Moore</u> noted that the "narrow avenue for the continued use of pendent appellate jurisdiction left open by <u>Swint</u>" does not apply if a "ruling on the merits" of the interlocutory appeal does not "resolve all of the remaining issues presented by the pendent appeal." <u>Id.</u>

Here, a ruling on the issue of qualified immunity will not resolve Plaintiffs' claims on which the district court granted summary judgment in favor of the WMPS Defendants. For example, the IDEA claim does not involve the application of the "danger creation" or "special relationship" theories. Indeed, because we find that the individual defendants Schutz and Herrera are not entitled

to qualified immunity on Plaintiffs' danger creation theory claims, our holding does not conclusively resolve any claims in this case against the WMPS Defendants. As a result, we refuse to exercise pendent jurisdiction over Plaintiffs' cross-appeal.

## CONCLUSION

For these reasons, in Case No. 97-2150, we REVERSE the district court's order denying summary judgment to individual defendant Clouthier on the "danger creation" theory, and we AFFIRM the district court's order denying summary judgment to individual defendants Schutz and Herrera on the "danger creation" theory; we REVERSE the district court's order denying summary judgment on the "special relationship" theory as to all Individual Defendants; and we REMAND for further proceedings not inconsistent with this opinion. Appeal No. 97-2167 is DISMISSED for lack of jurisdiction.