**Carolyn DOBSON, Individually, and in the Estate of John Robert Adamo, by and through the Personal Representative, Carolyn Dobson, Plaintiff,**

v.

**CITY AND COUNTY OF DENVER; Reza Kazemian, in his official and individual capacity; Leslie Groussman, in her official and individual capacity; Bruce Baumgartner, in his official and individual capacity; Richard Brasher, in his official and individual capacity; Richard Gary Brady, Defendants.**

No. CIV.A. 98–WM–806–PAC.

United States District Court,
D. Colorado.

Oct. 26, 1999.

David H. Miller, Paula Dee Greisen, Miller, Lane, Killmer & Griesen, LLP, Denver, CO, for Plaintiff.

John Milton Eckhardt, Geoffrey S. Wasson, City Attorney's Office, Denver, CO, Jeffrey James Colerick, Beatty, Gresham & Colerick, LLP, Colorado Springs, CO, Jeffrey S. Pagliuca, Holland & Pagliuca, PC, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

COAN, United States Magistrate Judge.[1]

Carolyn Dobson, the mother of deceased security guard John Adamo, and the personal representative of Adamo's estate brings claims against defendants for constitutional violations because defendant Richard Brady killed Adamo. Jurisdiction is under 28 U.S.C. §§ 1331 and 1343. Plaintiffs [2] also assert state law tort claims against defendant Richard Brady, defendant City and County of Denver and its named supervisors, invoking the supplemental jurisdiction of this court under 28 U.S.C. § 1367. Defendants City and County of Denver, Reza Kazemian, Leslie Groussman, Bruce Baumgartner, and Richard Brasher ("Defendants") move for summary judgment on all of plaintiffs' constitutional and state law claims against them, or, alternatively, for dismissal of plaintiffs' state law claims against them. Defendant Brady moves to dismiss the state claims against him for lack of jurisdiction. The motions are fully briefed. I heard oral argument on September, 30, 1999. For the following reasons, I grant both motions.

1. This Memorandum Opinion and Order is issued pursuant to the Order on Parties' Consent entered by United States District Court Judge Walker Miller on June 18, 1999. All parties to this case have consented to the final determination by a United States Magistrate Judge of Defendant City and County of Denver's Motion for Summary Judgment and Dismissal [filed July 20, 1998] and Defendant Brady's 12(b)(1) Motion to Dismiss for Lack of Jurisdiction Pursuant to 12(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367 [filed August 24, 1998] *See United States District Court for the District of Colorado General Order No.1999–1*; 28 U.S.C. § 636(c); D.C.COLO.LR 72.6.

2. There are technically two plaintiffs in this action, Carolyn Dobson and Adamo's Estate. The response brief is however, entitled "Plaintiff's Response..." Notwithstanding, the court will refer to both plaintiffs in this Order.

### I.

The following facts are undisputed unless otherwise noted, or, if disputed, are viewed in a light most favorable to plaintiff. John Adamo, ("Adamo"), the deceased, was a security guard employed by C & D Bonded Security Services ("C & D").[3] In January 1997, Adamo was assigned to perform security work at the Denver Waste Water Management Division of the Department of Public Works ("WWMD") complex. On January 10, 1997, he submitted an incident report stating that defendant Richard Brady ("Brady"), a city employee, was using WWMD facilities to wash his personal vehicle. After learning of the report, Jeff Snyder, Brady's second level supervisor and operations superintendent, ordered Brady to stop using WWMD's truck washing facility for his personal use. Later that day, Adamo submitted a second report alleging that Brady stormed into the security guard's office, pointed a finger at Adamo, and said "You little rat motherfucker; you and I are going to war." The content of the latter report was communicated to defendant Leslie Groussman ("Groussman"), a member of the WWMD management team, Jeff Snyder, and defendant Reza Kazemian ("Kazemian"), Director of Operations for WWMD.

In response to Adamo's second report, Kazemian met with Brady, who stated that he was angry and admitted making the statements in Adamo's report. Kazemian then informed Brady that WWMD did not permit such conduct in the workplace and ordered Brady to stay away from Adamo. Brady agreed. Groussman responded to Adamo's second report by discussing the matter at a meeting with Adamo and Kendall Hogue, the agency personnel manager. Groussman suggested to Adamo that he should explore the option of transfer-ring to another C & D facility if he felt threatened.

On Tuesday, January 14, 1997, Adamo submitted a third incident report which stated that Brady had confronted him, stating "If you're going to write something down, you'd better get it right." According to the report, Brady then stormed out of the guard office, but returned a short time later pointing a finger at Adamo, saying, "You better get your bike out of the garage." In response, Adamo told Brady he was under orders from Groussman to put it there, to which Brady replied, "You have no right" and "We'll see about that."

Upon receipt of Adamo's third report, Kazemian met with Hogue and Nick Skifaledes, a deputy manager of the Department of Public Works and senior manager of WWMD, to discuss the situation. They decided to place Brady on investigatory leave due to his conduct. After notifying Brady that he was on investigatory leave, Brady and his immediate supervisor, Adrian Johnson, met with Kazemian. Brady asked not to be placed on leave but to remain at work. Kazemian agreed to take back the letter placing Brady on Investigatory leave if Brady agreed to avoid all contact with Adamo, to which Brady replied, "I won't start anything." Kazemian took the letter back and Brady was permitted to continue working.

On January 15, 1997, Groussman met with Tamara Fox, the office manager for C & D, to discuss the Brady/Adamo issue and Brady's verbal threats. They discussed relocating Adamo or changing his hours so that they did not overlap with Brady's schedule.

On January 16, 1997, Kazemian was advised that Brady was asking questions about why Adamo was allowed to park his motorcycle inside the garage area while Brady was not allowed to use the City's

---

**3.** All claims against C & D were dismissed pursuant to the Notice of Dismissal of the Claims Asserted Against Defendant C & D Enterprises, Inc. d/b/a C and D Bonded Secu-rity Service, Inc., entered by United States District Court Judge Walker Miller on July 22, 1999.

truck washing facilities. Kazemian, Hogue, and Skifaledes determined that Brady should be placed on investigatory leave until after the predisciplinary meeting was held on January 21, 1997. Brady was handed a letter just before his shift ended that day advising him that he would be placed on investigatory leave. On the same day, Brady contacted Victor Padilla, the Deputy Manager of Operations at the City's Public Works Department, under which WWMD operates, and expressed his outrage about Adamo and the suspension. Brady said that if Padilla did not do something about Adamo, he would "do what [he] need[ed] to do!" Following Brady's phone call, Padilla contacted defendants Bruce Baumgartner, ("Baumgartner"), the Manager of Denver Public Works, and Richard Brasher ("Brasher"), Deputy Manager of Denver Public Works. Padilla informed Baumgartner and Brasher of Brady's anger and urged them to respond to the problem quickly. Plaintiffs claim that no further action was taken against Brady and that no one informed Adamo of Brady's investigatory leave or of Brady's threat as expressed to Padilla.

On January 17, 1999, the next day, Adamo telephoned Fox to discuss the Brady threats. Fox expressed concern for Adamo's welfare and they discussed options, such as a leave of absence, move to a different facility, or a change in shifts. Adamo declined those options and chose to remain at the WWMD facility. He stated that everything would be fine. Shortly thereafter, Brady came to the WWMD facility in violation of his investigatory leave, and shot Adamo to death. Plaintiffs state that Brady had keys to the facility, which defendants had failed to retrieve from Brady prior to his investigatory leave, and that Brady had used the keys to enter the facility and kill Adamo. Defendants claim that Brady did not have keys to the facility.

Pursuant to a plea bargain, Brady pleaded guilty to murdering Adamo and is now serving a sentence of forty years incarcer-ation within the Colorado Department of Corrections.

## II.

The purpose of summary judgment is to determine whether trial is necessary. *White v. York Int'l. Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The movant bears the initial burden to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to [the nonmovant's claim]." *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993)(internal citations omitted). The nonmovant has the burden to show that there are genuine issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995). To defeat a properly supported motion for summary judgment, "there must be evidence upon which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Conclusory allegations will not create a genuine issue of material fact necessitating trial. *White*, 45 F.3d at 363.

## III.

### 1. Substantive Due Process

Plaintiffs claim that defendants violated Adamo's substantive due process rights in failing to take appropriate measures to protect Adamo from the risk inherent in Brady's threats to Adamo. Defendants move for summary judgment arguing that there is no constitutional right to a safe workplace and that plaintiffs' allegations fail to satisfy the substantive due process "danger creation" test of liability for the acts of third parties. *See* Defendants' Brief in Support of Motion for Summary Judgment and Dismissal, at 8–10.

The Due Process Clause of the Fourteenth Amendment provides that no state "shall deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Generally, state actors are liable under the Due Process Clause only for their own acts and not for the violent acts of third parties. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196–97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir.1995). Liability attaches only under two limited exceptions to the rule: (1) the special relationship doctrine; and (2) the "danger creation" theory.[4] Under the "danger creation" exception, a state may be liable for an individual's safety "if it created the danger that harmed the individual ... provided that the other elements of a § 1983 claim have been satisfied." *Uhlrig*, 64 F.3d at 572. "[T]he danger creation theory must ultimately rest on the specifics of a substantive due process claim, i.e., a claim predicated on reckless or intentionally injury-causing state action which 'shocks the conscience.' " *Id.* Under this theory, plaintiffs must establish that:

(1) [plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [plaintiff] and other members of that group at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscious shocking.

*Id.* at 574. To satisfy the "shock the conscience" standard, plaintiff must demonstrate "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* at 574. This requires more than a showing that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. *See id.* Further, under certain circumstances "[w]here the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as *calculated indifference*, may suffice to shock the conscience." *Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir.1998) (emphasis added).

Plaintiffs argue that defendants' inaction, in not warning Adamo of Brady's threats, in not recovering Brady's keys, or in otherwise failing to follow their own internal regulations, exhibited conscience shocking calculated indifference. *See* Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, at 18–20. Even if such allegations were true, they would nonetheless fail to state a claim in the Tenth Circuit, absent a custodial relationship. To satisfy the danger-creation theory's conscience shocking standard, a plaintiff must show that defendants' *affirmative acts* subjected plaintiff to the injury-causing danger. *See Graham v. Independent School Dist., No. I–89*, 22 F.3d 991, 995 (10th Cir.1994) ("This state-created danger doctrine 'necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger.' ") (quoting *L.W. v.*

---

4. Plaintiff does not contend that the "special relationship" doctrine is applicable in this case. Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, at 13.

*Grubbs,* 974 F.2d 119, 121 (9th Cir.1992)). "[F]oreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship." *Id.* at 994. "'Inaction by the state in the face of a known danger is not enough ... the state must have limited in some way the liberty of a citizen to act on his own behalf.'" *Id.* (quoting *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.1993)), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). "[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253, 1263 (10th Cir. 1998). Plaintiffs do not argue that Adamo was in a custodial relationship with defendants and the record in this case fails to reveal any affirmative conduct by defendants that created a danger to Adamo.

Plaintiffs contend that defendants gave Adamo notice of some, but not all, of Brady's threats, thereby misleading Adamo as to the true nature of the danger Brady presented. *See* Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, at 21–22. In *Uhlrig,* the Tenth Circuit noted that affirmatively misleading an employee with respect to a danger present in the employee's working conditions could render an employer liable under section 1983. *See Uhlrig,* 64 F.3d at 575 n. 15 ("Of course, if the state misled a public employee as to his or her working conditions, ... the state could be held liable under § 1983."); *see, e.g., L.W. v. Grubbs,* 974 F.2d 119, 120, 123 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124

L.Ed.2d 660 (1993) (defendant's misrepresentation to plaintiff that she would not work with sex offenders and subsequent placement of plaintiff alone with known violent sex offender contributed toward finding of § 1983 liability). Plaintiffs claim that defendants apprised Adamo of all of Brady's threats towards Adamo except Brady's statement to Padilla, "I have to do what I have to do." Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, Exhibit 5. Defendants further did not inform Adamo of Brady's suspension. Answer, at ¶ 10. Consequently, plaintiffs argue, defendants misled Adamo by allowing him to go to work on January 17, 1997 with a false sense of security since he was unaware of those recent and most dangerous developments. Even if Adamo had been on notice of the statement to Padilla and Adamo's suspension, plaintiffs still have failed to point to any affirmative conduct by defendants, such as willful misrepresentation, that misled Adamo. Instead, plaintiffs again rely upon defendants' alleged *failures* to act as forming the basis of their claim. *See* Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, at 22.[5]

■ Finally, to the extent that plaintiffs argue that defendants caused Adamo's death by their affirmative acts in permitting Adamo to work on the day he was killed or by further aggravating Brady through reprimands and suspension, their argument is without merit. Adamo's murder is simply "'too remote a consequence of [defendants'] action to hold them responsible under the federal civil rights law.'" *Graham,* 22 F.3d at 995 (enrolling student in school prior to school officials'

---

5. Plaintiffs state in their argument,
   One of the main points of plaintiff's case is that the City and the individual Defendants did not warn John Adamo. They did not warn him of Brady's serious threat to Padilla, and through Padilla to Defendants Baumgartner and Brasher. They did not warn him that Brady was suspended and

should not be admitted to the facility. And they did not warn him that they had issued a disciplinary notice of hearing to Brady....
   Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, at 22.

knowledge of other student's violent propensities did not constitute affirmative action under the danger creation theory, quoting *Martinez v. State of California*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980)). "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dept. of Social Services*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Accordingly, I find that plaintiffs have not provided facts which, when viewed in the light most favorable to plaintiffs, would establish a constitutional violation.

### 2. Failure to Train

Because I find that summary judgment in favor of defendants on plaintiffs' danger-creation claims is warranted, I also must find that plaintiffs' claim for failure to train under § 1983 fails because there is no underlying constitutional violation. "[A] claim of inadequate training, supervision, and policies under § 1983 cannot be made out against a supervisory authority absent a finding of constitutional violation of the person supervised." *Webber v. Mefford*, 43 F.3d 1340, 1344–45 (10th Cir.1994); *Watson v. City of Kansas*, 857 F.2d 690, 697 (10th Cir.1988)("[I]t would be improper to allow a suit to proceed against the city if it was determined that the officers' action did not amount to a constitutional violation. . . . "). Since the government officials' alleged conduct did not violate Adamo's constitutional rights, plaintiffs cannot state a claim for unconstitutional failure to train against defendants, Brady's supervisors.

### 3. Qualified Immunity

■ Defendants have asserted the qualified immunity defense in response to plaintiffs' constitutional claims against them in their individual capacities. Qualified immunity shields public officials from civil damages liability if their actions did not " 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pino v. Higgs*, ·75 F.3d 1461, 1467 (10th Cir.1996)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). When a public official raises the defense of qualified immunity, the court first determines whether the conduct of which plaintiff complains constitutes a violation of a constitutional or statutory right; if so, the court then addresses whether that right was clearly established at the relevant time. *Gehl v. Koby*, 63 F.3d 1528, 1533 (10th Cir.1995)(citing *Siegert v. Gilley*, 500 U.S. 226, 232–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). Plaintiff must therefore "present facts which if true would constitute a violation of a clearly established law." *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir.1988)(quoting *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir.1987) (internal citation omitted)). If the plaintiff cannot meet his burden, the defendant is entitled to qualified immunity and the constitutional claim must be dismissed. Because I have found that plaintiffs have failed to state a claim for denial of substantive due process under the danger creation theory, which would be a violation of a constitutional right, I find that defendants are entitled to the defense of qualified immunity.

### 4. Rule 56(f) discovery

■ Finally, I deny plaintiffs' motion for additional discovery under Fed. R.Civ.P. 56(f). A plaintiff requesting the opportunity to conduct discovery under Fed.R.Civ.P. 56(f) must provide the court with an affidavit which explains why facts which would preclude summary judgment cannot be presented. *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir.1992)(citing 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure*, § 2740 at 530 (1983)). Further, a plaintiff must explain "how additional time will enable him to rebut movant's allega-

tions of no genuine issue of fact." *Patty Precision v. Brown & Sharpe Mfg. Co.,* 742 F.2d 1260, 1264 (10th Cir.1984). Bald assertions that evidence supporting the plaintiff's claims is in the hands of the opposing party are insufficient. *Id.*

██ Once defendants assert the qualified immunity defense as a ground for summary judgment, the plaintiff must demonstrate how discovery will raise a genuine fact issue as to the defendants' entitlement to qualified immunity. *Lewis v. City of Fort Collins,* 903 F.2d 752, 758 (10th Cir.1990). "Insubstantial lawsuits 'against government officials [should] be resolved prior to discovery and on summary judgment if possible.'" *Jones v. City and County of Denver,* 854 F.2d 1206, 1211 (10th Cir.1988)(quoting *Anderson v. Creighton,* 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). When the qualified immunity defense has been raised, the plaintiff may not use discovery as a fishing expedition to flesh out the merits of his claims. *Sawyer v. County of Creek,* 908 F.2d 663, 668 (10th Cir.1990).

Here, the discovery plaintiffs seek is to clarify the content and nature of discussions regarding what steps defendants took or failed to take with respect to warning Adamo about Brady or recovering Brady's keys. *See* Motion to Submit Plaintiff's Fed.R.Civ.P. 56(f) Affidavit to Supplement Plaintiff's Response to Motion for Summary Judgment, Greisen Affidavit. As discussed previously in this order, plaintiffs' argument rests on defendants' repeated failures to act. Even assuming additional discovery revealed conclusive evidence of such failures, the challenged conduct simply could not rise to the level of a constitutional violation, which requires affirmative action. Therefore, because plaintiffs' requested discovery would not raise a genuine issue of fact under the danger-creation theory of liability, I deny the motion.

6. The Act does not define "maintenance."

### 5. State Law Claims

Defendants argue that plaintiffs' state law claims against defendants lack subject matter jurisdiction under the Colorado Governmental Immunity Act ("GIA"), COLO.REV.STAT. § 24–10–101, *et seq,* because providing a safe workplace is not a duty vested in the WWMD "by law." The plaintiffs bear the burden of proof as to whether a public entity's immunity has been waived under the GIA because it concerns subject matter jurisdiction under Colo. R. Civ. P. 12(b)(1). *Swieckowski v. City of Fort Collins,* 934 P.2d 1380 (Colo. 1997); *Capra v. Tucker,* 857 P.2d 1346 (Colo.App.1993). The relevant section of the GIA states:

> A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant except as provided otherwise .... Sovereign Immunity is waived by a public entity in an action resulting from ... the *operation and maintenance* of any public water facility, gas facility, sanitation facility ... by such public entity.

COLO.REV.STAT. § 24–10–106(1)(f) (1997) (emphasis added). The statute defines "operation" as "the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law with respect to the purposes of any ... public water [or] sanitation ... facility." [6] COLO.REV.STAT. 24–10–103(3)(a). The term "operation," however, should not be construed to include "[a] failure to exercise or perform any powers, duties, or functions not vested by law in a public entity or employee with respect to the purposes of any public facility...." COLO.REV. STAT. 24–10–103(3)(b)(*l*). The Colorado Court of Appeals has found that "sovereign immunity is waived only if the act or omission relates to the purpose of the facility." *Richland Development Co. v. East Cherry Creek Valley Water & Sanitation*

*District,* 934 P.2d 841, 843 (Colo.App.1996). Further, "the GIA requires that exceptions to governmental immunity be interpreted narrowly in order to avoid imposing liability not specifically provided for in the statute." *City and County of Denver v. Gallegos,* 916 P.2d 509, 510 (Colo.1996) (*en banc* ). It is undisputed that plaintiffs' state law claims against defendant City and County of Denver, *et al,* are tort claims. Therefore, the GIA applies.

Defendants argue that WWMD's purpose is to provide a storm and sanitary sewer system for public use and that maintaining a safe workplace is not related to the facility's purpose. *See* Defendants' Brief in Support of Motion for Summary Judgment and Dismissal, at 16–17. Plaintiffs admit that defendants did not have a duty to Adamo to maintain a safe workplace. *See* Plaintiff's Response to the City and County of Denver's Motion for Summary Judgment and Dismissal, at 30. Instead, plaintiffs argue that their claims are exempt from the GIA because Adamo was killed as a result of defendants' failure to follow their internal personnel policies, rules and regulations. *See id.* at 34–35. Plaintiffs claim that such policies are integral to the purpose of operating a sanitation facility because the policies assist in implementing the broad statutory purpose for sanitation districts, "[t]o provide for ... treatment and disposal works and facilities." *Id.* at 30–35 (citing COLO.REV. STAT. § 32–1–103(18)). Plaintiffs argue that the facts in the present case are analogous to those in *Smith v. Town of Estes Park,* 944 P.2d 571 (Colo.App.1996) where the Colorado Court of Appeals held that COLO.REV.STAT. § 24–10–106(1)(f) waived sovereign immunity for plaintiff's suit arising out of injuries from slipping on ice accumulated due to poor management of the storm drainage system.

■ I find no merit in plaintiff's argument. *Smith* is inapposite because maintenance of a storm drainage system is clearly related to the purpose of providing a sewer system, whereas following internal personnel policies is at most ancillary to the facility's purpose and functioning. *See Richland Development Co.,* 934 P.2d at 843 (accurate record keeping and providing information to the public are not duties or functions vested by law in the operation of a sanitation district); *Pack v. Arkansas Valley Correctional Facility,* 894 P.2d 34 (Colo.App.1995) (GIA barred plaintiff's slip-and-fall claim because maintenance of correctional facility parking lot is ancillary to the purposes of running of the correctional facility); *cf. Jenks v. Sullivan,* 826 P.2d 825, 827–28 (Colo.1992) (GIA exemption for injuries arising from dangerous conditions of public building did not include injuries caused by third parties inside public facilities), *rev'd on other grounds, Bertrand v. Bd. of Cty. Comm'rs of Park County,* 872 P.2d 223 (Colo.1994). Moreover, the GIA expressly does not exempt injuries arising out of a failure to perform duties or functions not vested by law with respect to the purposes of a sanitation facility, such as an internal personnel disciplinary policy. COLO.REV. STAT. 24–10–103(3)(b)(*l* ); *See Richland Development Co.,* 934 P.2d at 843; *Howard Through Young v. City and County of Denver,* 837 P.2d 255, 257–58 (Colo.App. 1992) (no exemption under GIA for Sheriff's negligent management of pre-trial services or execution of search warrants since such functions are not related to the purposes of operating a jail).

Plaintiffs essentially contend that defendants' internal personnel policies established a standard of care prohibiting dangerous, work-related situations to exist— i.e. a duty to provide a safe work environment. Further, by failing to adhere to these policies, plaintiffs assert that defendants breached their duty of care, which resulted in Adamo's death. Notably, plaintiffs do not base their claims of defendants' failure to follow employer policies in contract law, which the GIA would not have barred. Instead, plaintiffs appear to rest these allegations only on their apparent standard of care argument. Accord-

ingly, I conclude that maintaining a safe work environment by diligently following personnel policies is at best ancillary to the purpose of operating a sanitation facility and therefore barred by the GIA.

Because this court lacks subject matter jurisdiction over plaintiff's state law claims under the GIA, I do not address whether defendant is entitled to summary judgment on those claims under the Colorado Worker's Compensation Act.

### 6. Brady's State Law Claims

I next grant Defendant Brady's Rule 12(b)(1) Motion to Dismiss for Lack of Jurisdiction Pursuant to 12(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367. In his motion, defendant Brady asks the court to exercise its discretion under 28 U.S.C. § 1367 and decline to exercise supplemental jurisdiction over plaintiff's state law claims against him on the assumption that the federal claims against the other defendants would be dismissed.

■ Generally, dismissal of a plaintiff's federal claims, on which the court's original jurisdiction rests, permits the court to decline to exercise supplemental jurisdiction over a plaintiff's related state claims. 28 U.S.C. § 1367(c)(3); *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1492 (10th Cir.1995). A District Court has jurisdiction, however, to try pendant state claims, even absent triable federal claims. *Thatcher Enterprises v. Cache County Corp.,* 902 F.2d 1472, 1478 (10th Cir.1990); *see also, Jones v. Intermountain Power Project,* 794 F.2d 546, 550 (10th Cir. 1986)("A federal court justifiably may retain jurisdiction of the pendent claims when substantial time and energy have been expended on the case prior to the disposition of the federal claims."). The court's discretion to dismiss under § 1367(c)(3), however, "should be exercised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction."

*Thatcher Enterprises,* 902 F.2d at 1478. If such concerns are not present upon dismissal of all federal claims at some point prior to trial, dismissal of state claims is usually warranted. *See id.*

This case was filed in April 1998. The record reflects that the discovery to date has progressed only on behalf of plaintiffs against defendants City and County of Denver, *et al,* but not defendant Brady. Because discovery has not begun with respect to Brady, I find that judicial economy would be served if the claims against him were dismissed without prejudice and with leave to file in state court.

Accordingly, it is

ORDERED that Defendant City and County of Denver's Motion for Summary Judgment and Dismissal [filed July 20, 1998] is GRANTED. The claims against the City and County of Denver, Reza Kazemian, Leslie Groussman, Bruce Baumgartner and Richard Brasher are **dismissed with prejudice**. It is further

ORDERED that Defendant Brady's 12(b)(1) Motion to Dismiss for Lack of Jurisdiction [filed August 24, 1998] is GRANTED in that the claims against him are **dismissed without prejudice and with leave to file in state court**. It is further

ORDERED that the complaint and cause of action are dismissed. It is further

ORDERED that defendants shall file their bills of costs within ten days of this order.