**Clifford LANSDOWN, the Administrator of the Estate of Roger Dean Lansdown, Deceased Plaintiff**

**v.**

**Bill CHADWICK, et al. Defendants**

**John Urban and Andy Urban Plaintiffs**

**Baxter County, Arkansas, and Charlie Garrison Defendants**

No. CIV. 99–3062, CIV. 99–3063.

United States District Court, W.D. Arkansas, Harrison Division.

Oct. 5, 2000.

Mike J. Etoch, Louis A. Etoch, Helena, AR, for Lansdown.

Edward Witt Chandler, Mountain Home, AR, for Urbans.

Ronald P. Kincade, Mountain Home, AR, Thomas N. Kieklak, Arkansas Municipal League, Little Rock, AR, for Chadwick & City of Gassville.

Bob Sexton, Duncan & Rainwater, Little Rock, AR, for Hopman, Baxter County, Charlie Garrison.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

This consolidated case is before the court on the defendants' motions for summary judgment. Defendants have filed two separate motions. In the first motion defendants seek summary judgment on all claims asserted by John Urban and Andy Urban. In the second motion defendants seek summary judgment on all claims asserted by Clifford Lansdown, the administrator of the Estate of Roger Dean Lansdown.·

### Background.

These civil rights actions arise out of the events that occurred on February 8, 1997, in the City of Gassville, Arkansas.

On that day, William R. ("Bill") Chadwick, a part-time patrol officer for the City of Gassville heard over a scanner that someone had run a vehicle into the Plumlee Tire building. *Affidavit of William R. Chadwick* at ¶ 1–2. Chadwick who had been preparing to go to lunch with his wife, phoned the Sheriff's office and was told that the vehicle was heading west into Gassville. *Id.* at ¶ 2–3. Chadwick got in his patrol car and reported to the dispatcher that he was on duty. *Id.* at ¶ 3.

The dispatcher told Chadwick to respond to a gas "drive off" at the Lacefield Citgo Station in Gassville. *Chadwick Affidavit* at ¶ 4. Upon arriving at the gas station, Chadwick was told by Lou Ann Richards, the clerk on duty, that a man wearing a ski mask had entered the station, began fueling his truck, and then came into the station stating that he needed to charge $88.00 worth of kerosene. *Defendants' Exhibit* 3.

When Richards went to the phone to check on the charge, the man wearing the ski mask, who was later identified as Roger Dean Lansdown, got her charge book and wrote "God" on the top. *Id.* He then went back to his truck and left with the gas nozzle lying on the ground. *Id.* He failed to pay for $25.33 worth of gas. *Id.*

Richards gave Chadwick a description of the truck Lansdown had been driving and

pointed to a home across the street where it had gone. *Chadwick Affidavit* at ¶ 4. Chadwick recognized the truck as belonging to Lansdown. *Id.*

According to Chadwick, he knew Lansdown had a history of mental and emotional illness and had a propensity to become violent. Chadwick went to the Lansdown home where he saw Lansdown, who was still wearing the ski mask, spreading gasoline on a shed and a vehicle in the shed and lighting a fire. *Id.* at ¶ 6. Lansdown also spread gasoline and started fires in various other places on his property. *Id.*

James Harris, Lansdown's neighbor, saw an older model brown and tan pick-up truck enter Lansdown's driveway. *Affidavit of James Harris* at ¶ 2. A man wearing a ski mask got out of the truck, took some papers and liquid to the ditch, and set fire to the papers. *Id.* The man then went toward Harris' house and Harris went to block the man who then veered toward a storage yard in Lansdown's backyard. *Id.* at ¶ 3. When he got to the shed, the man ripped the shed doors down. *Id.*

When Harris asked what he was doing, the man responded "Just playing a game James." *Harris Affidavit.* at ¶ 4. When he made this statement, Harris realized the man wearing the ski mask was Lansdown his neighbor. *Id.*

Harris told Chadwick that Lansdown had ceased taking his medication the week prior. In an attempt to verify whether the man in the ski mask was Lansdown, Chadwick shouted his name. *Chadwick Affidavit* at ¶ 7. When Chadwick shouted, the man in the ski mask looked at Chadwick, set fire to the shed, and ran to the rear door on the east side of the house and attempted to open the door. *Id.* When Lansdown could not get the door open, he said "Sorry, Bill," and broke through the door with his hands. *Id.*

Some months prior to this incident, Chadwick had been at a yard sale at Lans-

down's and Lansdown had shown Chadwick two guns, a rifle and a shot gun. *Id.* at ¶ 9. Chadwick also knew Lansdown had attacked another man with a knife at his place of employment. *Id.* at ¶ 15. From the moment he arrived, Chadwick states he "kept thinking Lansdown would come running out of the house shooting." *Id.* Ultimately, no firearms were recovered.

Based on the behavior he observed and on his past knowledge of Lansdown, Chadwick feared Lansdown was going into the house to get a gun. *Id.* at ¶ 9. Chadwick therefore ordered Harris to go into his own house. *Id.*

Chadwick got back in his squad car and backed out of the driveway and away from the house. *Id.* at ¶ 10. Chadwick then called for the assistance of the fire department and for police back-up. *Id.* Chadwick also asked the dispatcher to contact Joyce Lansdown, Roger Lansdown's mother. *Id.*

Chadwick heard breaking glass and when he looked toward the house he saw Lansdown outside the house attempting to put a piece of paper, later determined to be a page from the bible, on a tree situated directly in front of the window. *Id.* at ¶ 10 & 11. Lansdown then re-entered the house through the window. *Id.*

Harris saw Lansdown jump through the window breaking the glass in the process. Just before Lansdown jumped through the window, Harris saw Lansdown spreading gasoline inside the house.

After Lansdown re-entered the house, flames were observed and the house began filling with smoke. *Chadwick Affidavit* at ¶ 10. After the fire was started, Harris saw Lansdown move out of the living room and into the bedroom side of the house. *Harris Affidavit* at ¶ 8. Neither Chadwick nor Harris saw Lansdown alive again

Harris told Chadwick that Lansdown had no guns in the house and was not armed. *Plaintiffs' Exhibit I* at ¶ 9. Chadwick ordered Harris to "stay away and not attempt rescue." *Id.* Harris states he knew something was "terribly wrong" but was not afraid of Lansdown. *Id.* Harris was, however, afraid of the law enforcement officers who were armed and acted hostile. *Id.* at ¶ 10.

In response to Chadwick's requests for assistance, other law enforcement officers began arriving as did members of Gassville's and Cotter's volunteer fire departments. The first to arrive at the scene was John Dale Tyler, a Gassville firefighter and police officer for the City of Mountain Home. *Chadwick Affidavit* at ¶ 12. Tyler asked Chadwick what the situation was and then Tyler, holding a rifle, took a position on Johnson street where he could watch the back of the house. *Id.* at ¶ 12.

The next to arrive at the scene was Jack Burkheart, Chief of Police for the Cotter Police Department. *Chadwick Affidavit* at ¶ 13. After Chadwick explained the situation to Burkheart, Burkheart drove 60 feet down Buford Cutoff, the street running in front of the Lansdown house, and "took a position 30 feet to the east of the house to observe whether Lansdown would exit on the east side of the house." *Id.* at ¶ 13. When Harris came out of his house again, Burkheart told him to get back in the house. *Harris Affidavit* at ¶ 8. Harris then "hollered at [Burkheart] that the house was burning and Roger was in there, and he yelled again for me to get back in the house." *Id.*

The next person Chadwick saw arrive was Elvin Weaver, Chief of Police of the City of Gassville. *Chadwick Affidavit* at P 14. Tim McFarland, the Fire Chief for the City of Gassville, arrived at about the

same time. *Id.* Chadwick explained the situation to them. *Id.*

Chadwick then drove slowly to the front of the house using his car to cover Police Chief Weaver. *Chadwick Affidavit* at ¶ 16. Weaver, armed with a shot gun, cautiously approached the house, using the trees in the front yard to shield him from the house. *Id.* He then covered Fire Chief McFarland and other firefighters who approached with a fire hose and began to spray the Lansdown house with water. *Id.*

According to Chadwick, when the Cotter firefighters arrived he escorted them around the east side of the house with his weapon drawn in case Lansdown came out with a weapon. *Chadwick Affidavit* at ¶ 18. After a period of time, Chadwick was ordered to respond to a report of an intoxicated person at Wayne's Super Mart. *Id.* at ¶ 20. Chadwick returned to the Lansdown home about thirty minutes later. *Id.*

According to Andy Urban,[1] when he first arrived at the scene, he approached the house with a hose and was told to stop by a police officer holding what appeared to be a shot gun. *Deposition of Andy Urban* at 21–22. When Andy asked what was going on the officer replied that there was a man with a gun in the house. *Id.* at 22. Andy had also seen two other officers with guns pulled. *Id.* at 22–23.

When John Urban, the safety officer for the Cotter Volunteer Fire Department, arrived he checked with a Gassville firefighter and was told the Gassville Police Department was holding the firefighters up because they believed there might be an armed man inside the house. *Deposition of John Urban* at 27–28. After about five minutes, they got the okay to fight the fire. *Id.* at 28.

---

1. To avoid confusion we will refer to Andy Urban and John Urban by their first names

John then gave Andy the go ahead to begin spraying the house with water. *Deposition of Andy Urban* at 22–24. Initially, Andy began fighting the fire on the left side of the house but was told to move to the right side of the house to cool it off and keep it from igniting. The glass in the front bedroom window was removed so that the firefighters could better cool off this area of the house.

At some point, David Orsborn, then a deputy sheriff of Baxter County, was told by Sargent Tommy Steen to place crime scene tape around the accident scene to secure the area. A firefighter, apparently Roger Olney, tore the crime scene tape. Orsborn went back and retied the tape.

John gave the order for Andy to suit up in his self contained breathing apparatus (SCBA). Another firefighter, Ed Sessions, called for a spanner wrench for the gas valve. *Deposition of Andy Urban* at 33. When Andy went to get the spanner wrench he had to go under the crime scene tape. *Id.* at 40. As he went under the tape, it caught on his air tank and broke. *Id. See also Deposition of John Urban* at 35. Andy got the wrench and headed for the gas meter when he heard someone screaming at him. *Deposition of Andy Urban* at 33.

> The next thing Andy knew:
>
> somebody grabbed hold of me and it was like that dude in the jacket and he just started going off on me, told me he says, "This is the second time you broke the f—king tape," and he says, "I'm going to arrest you for interfering with a police investigation," and he started to point his finger and he started yelling some more crap at me and I was trying to get loose from him. I don't know if it was because of me or because of Roger. I never even seen Roger, but I broke free from him, and ran for the meter, and from what I hear, he started chasing me

across the grass and Roger stopped him, and after that I don't know.

*Id.*

The officer involved in the altercation with Andy was apparently Orsborn. Andy received no physical injury as a result of the incident. *Deposition of Andy Urban* at 41.

John was near the fire truck and witnessed an officer grabbing Andy. *Deposition of John Urban* at 36. John saw Roger Olney go over there and put his hand on the officer's shoulder. *Id.* According to John, the officer "gave [Olney] a body check and knocked him backwards, grabbed him by the harness, started shoving him around and somebody else grabbed him and started choking him, grabbed him by the neck running him backwards, screaming at him." *Id.* at 43. The officer who grabbed Olney by the throat in a choke hold was Sergeant Kenny Hopman with the Baxter County Sheriff's Office. *Deposition of Charles Garrison* at 57.

John ran over there and got between the officer and Olney and in the process John got struck. *Id.* at 36. John told the officer to get his hand off his firefighter and the officer responded that it was a police scene. *Id.* at 43–44. The officer then told John that he was under arrest. *Id.*

According to Olney, he approached the officer who looked like he was going to attack Andy and said "Hey, why don't you leave this firefighter alone?" *Plaintiffs' Exhibit E.* The next thing Olney knew:

> the man attacked me, pushing me backwards about 20 or 25 feet.... The next thing I knew another unknown man wearing a black jacket came out of nowhere and put his hand around my

throat and told me to shut up and that I was under arrest.

*Id.*

According to Olney, after a period of time, a man later identified as Garrison, came over and asked Olney whether he was going to calm down. *Id.* When Olney responded affirmatively, Garrison told everyone to leave Olney alone. *Id.*

According to John, there were three officers involved in the altercation. *Id.* at 44. John then went to get the Sheriff. *Id.* at 51. When John turned around, Hopman had Olney by the throat again. *Id.*

Garrison saw Hopman and Jeff Howell restraining the firemen. Specifically, Howell was holding Olney's left arm and Hopman had a hold of his throat. *Deposition of Charles Garrison* at 43. Garrison told Hopman to turn Olney loose. *Id.* Howell asked if Garrison wanted Olney arrested and Garrison replied no. *Id.* at 44.

The officers' version of the events is different. Orsborn stated that while he was stringing the crime scene tape a fireman broke the tape by walking up to it, grabbing it, and pulling it apart. *Plaintiffs' Exhibit V, Deposition of David Orsborn* at 36. Then Roger Olney broke it by walking through it. *Id.* at 37. To get his attention, Orsborn walked up to Olney and touched him on the shoulder, and said, "Do you mind not breaking the tape?" *Id.* at 39–40.

According to Orsborn, Olney responded that he "didn't give a damn about the crime scene tape" and was only worried about the fire. *Id.* at 40–41. Orsborn responded he didn't care about the house because the fire was out. *Id.* at 41.

At this point, Orsborn says Olney grabbed him and started pushing him towards the truck. *Id.* at 42–43. Orsborn then put his hands up in the air trying to avoid Olney. *Id.* at 43. Olney continued to push Orsborn 15 to 20 feet. *Id.* at 44. At this point other deputies and firefighters came up and grabbed Olney and pulled him back. *Id.*

Hopman testified he "heard the altercation start with the yelling about the tape." *Plaintiffs' Exhibit W, Deposition of Kenneth Hopman,* at 54. Hopman looked in the direction of the sound and saw Olney had Orsborn "by the shirt pushing him sideways—this way towards [a] truck." *Id.* at 57. Orsborn was in a defensive push. *Id.* at 60.

Hopman testified he and Jeff Howell ran over there. *Id.* at 61. When Hopman got there Olney took his hands off Orsborn. *Id.* at 60. Hopman pulled them apart. *Id.* at 62.

At that point, Hopman says that Olney "backed up and ripped off his helmet, threw it down on the ground and made another charge." *Id.* at 62. In Hopman's view, Olney was in a violent rage. *Id.* In an effort to hold Olney, Hopman grabbed him in the throat/collar area. *Id.* at 66. Hopman told Olney that if he didn't quiet down he would be arrested. *Id.* at 68.

With respect to rescue attempts, Harris testified that one of the "Cotter firemen was ordered out of the house after he entered to rescue and saw Roger and had contact with him as he searched inside in his SCBA rescue equipment." *Plaintiffs' Exhibit I* at ¶ 11. Harris' statement was not supported by the statement of any members of the Cotter volunteer fire department.

However, by affidavit Thomas Nathan Weindruch, a volunteer fireman in Gassville, states that immediately upon arriving at the Lansdown fire he got his SCBA gear and protective equipment and got ready to rescue the person in the house. *Plaintiffs' Exhibit U, Affidavit of Thomas Weindruch* at 1. When he entered the

house, Weindruch found "a lot of officers in the front room." *Id.* at 2. The officers told him to leave the crime scene. *Id.* At that point, the fire flashed up and the officers ran out of the house. *Id.*

Weindruch left the house after fighting the fire because he was running out of air., *Id.* After he changed his air bottle and was returning to the house, Weindruch witnessed the confrontation between Hopman and Olney. *Id.*

Weindruch then returned to the front of the house and looking through the bedroom window, he could see Lansdown lying face down. *Plaintiffs' Exhibit U, Affidavit of Thomas Weindruch* at 3. Weindruch states they "could not tell if [Lansdown] was alive or dead. The smoke was high in the room. We were not close enough to take a pulse and under the orders or directions by the police or deputies we could not enter the house or attempt a rescue." *Id.* at 4.

After Andy heard someone call out that they saw Lansdown through the window, Andy testified he went up and looked and said, "Hey, ... you know we need to get him out of there." *Deposition of Andy Urban* at 35. According to Andy, an officer, believed to be Sonny Newman, who was standing there replied, "No, let that f—ker die." *Id.* at 35–36. When Andy replied that a pulse should at least be taken, one of the officers said "No, f—k him, he's dead." *Id.*

While no one specifically told Andy not to go into the room, he got the impression the various law enforcement officers standing around did not want him "anywhere near there." *Id.* at 35–36 & 43–44. In Andy's words, "[i]t was implied that you're not going to go, you need to leave now." *Id.* at 43–44.

Lansdown was face down on the bed with his hands over his face. *Deposition of Andy Urban* at 36–37. Lansdown still had the ski mask on. *Id.* at 37.

Andy never received an order for extraction of Lansdown from the house. *Deposition of Andy Urban* at 34. He never saw the Gassville fire department get an order for extraction. *Id.*

When Chadwick returned to the Lansdown house, the firefighters were still attempting to control the fire. *Chadwick Affidavit* at ¶ 21. Chadwick was told Lansdown was in the front bedroom on the west side of the house and was dead. *Id.* at ¶ 22.

According to the Arkansas State Crime Laboratory, the cause of Lansdown's death was smoke and soot inhalation. *Defendants' Exhibit C.* The death was determined to be a suicide. *Id.*

An investigation later revealed that Lansdown had been acting in an unusual manner all day. During the morning, he had asked his father "What is the quickest way to get to God?" Lansdown then went to work at Plumlee Tire and was acting strange. He asked a fellow employee to baptize him. When Wendle Lee replied that he could not perform a baptism, the two went to the Cotter Church of Christ where Lansdown was baptized. When he left the church Lansdown said the "Devil was after him."

When he returned to work, Lansdown was sent home by Bob Plumlee. Lansdown then attempted to set his truck and his parent's Clarkridge, Arkansas, residence on fire. Lansdown then returned to Plumlee Tire where he crashed through a closed garage door.

By affidavit Dr. Don McDonald, a medical doctor and a psychiatrist, states it is his opinion that Lansdown was "mentally ill, suffering from major depression with psychotic features or, more likely, bipolar disorder, mania with psychotic features." *McDonald Affidavit* at ¶ 3. In Dr. McDonald's opinion Lansdown "could have

lived a long and useful life by proper intervention during the crisis of February 8, 1997, and medical treatment and care, including psychiatric treatment, counseling, therapy, and medication." *Id.* at ¶ 4.

Hopman was disciplined as a result of his use of a choke hold on Olney. Hopman was given two weeks off without pay. *Deposition of Charles Garrison* at 25.

On September 1, 1999, Clifford Lansdown, the administrator of the Estate of Roger Dean Lansdown, filed case number 99–3062, a civil rights action against Chadwick, Hopman, Baxter County, Arkansas, the City of Gassville, Arkansas, and Garrison, the former Sheriff of Baxter County. The complaint asserts the following claims: (1) a § 1983 claim that Lansdown was deprived of his substantive due process rights to life, liberty, and property; (2) a § 1983 claim that Lansdown was unlawfully seized in violation of the Fourth Amendment; (3) a state law claim for the tort of outrage; and (4) a state law claim for wrongful death.

On September 2, 2000, John Urban and Andy Urban filed case number 99–3063, a civil rights action against Baxter County, Arkansas, and Garrison. The complaint asserts the following claims: (1) a § 1983 excessive force claim; (2) a § 1983 unlawful arrest claim; and (3) a state law claim for assault.

### Summary Judgment Standard.

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-

moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.,* 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank,* 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing, Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985)).

### Discussion.

As noted above, defendants have filed two separate motions for summary judgment. Together the motions seek judgment on all claims asserted by all plaintiffs. We will address each claim separately.

### 1. Lansdown Case—Official versus Individual Capacity Claims.

Defendants first argue that they have been sued in their official capacity only by the Estate. Should the court construe the case to include claims against them in their individual capacity, defendants request the right to plead additional affirmative defenses such as qualified immunity.

■ The Estate submits it sued each defendant in both their individual and official capacities. The Estate argues the Federal Rules of Civil Procedure require only notice pleading. It also points out that nowhere in the complaint does it state this is an official capacity only lawsuit. As one element of a § 1983 claim is that the actor acted under color of law, the Estate argues it was required to name the title of

the individual actor. In doing so, the Estate contends it is not precluded from asserting individual capacity claims.

The Estate acknowledges that the complaint does not specifically state it is suing the defendants in both capacities. However, it points out that it named each separate individual and each separate governmental entity. Having done so, the Estate contends its clear intent was to sue the defendants both individually and officially.

Unfortunately for the Estate, the Eighth Circuit has not been lenient in this regard. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir.1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24–27, 112 S.Ct. at 361–62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25–27, 112 S.Ct. at 362.

*Gorman*, 152 F.3d at 914.

 The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir.1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir.1999) (In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim as against the official in his official capacity only.[2] *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) ("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir.1995) ("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their

---

**2.** Some courts have abandoned this presumption that a plaintiff is suing a defendant in his official capacity only when individual capacity is not specifically alleged where the relief sought requires that the defendant be sued in his individual capacity and the unconstitutional conduct forming the basis of the complaint involves the defendant's individual actions. *See e.g., Biggs v. Meadows*, 66 F.3d 56 (4th Cir.1995). In fact, as noted in *Biggs* the majority of circuits have abandoned the presumption and instead look to the substance of the plaintiff's claims, the relief sought, and the course of the proceedings in the lower court to determine the nature of the § 1983 suit when a plaintiff fails to allege capacity. *Biggs*, 66 F.3d at 59. However the Eighth Circuit has not abandoned this presumption. *See e.g., Murphy v. State of Arkansas*, 127 F.3d 750, 755 (8th Cir.1997) ("Although other circuits have adopted a more lenient pleading rule, we believe that our rule is more consistent with the Supreme Court's Eleventh Amendment jurisprudence. In any event, we are bound by *Egerdahl* and *Nix*.).''

personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

A review of the complaint in this case shows that plaintiff has failed to specifically plead whether the individually named defendants were being sued in their official or individual capacity. We therefore conclude the Estate has sued the defendants in their official capacities only.

■ In the event the court so concluded, the Estate alternatively requested leave to amend the pleadings to conform to the evidence under Rule 15(b) of the Federal Rules of Civil Procedure. The Estate argues that had defense counsel not waited until the eve of trial to file the motion for summary judgment and had instead brought this issue to the court's attention early on, then the Estate could have promptly requested leave to amend to avoid any possible confusion.

The court will not grant the Estate leave to amend at this late date. The trial of this matter was continued from the week of September 25, 2000, to October 31, 2000. The discovery cut-off is thirty days prior to the scheduled trial date. An amendment to include individual capacity claims would significantly alter the stakes for the named defendants and would also carry with it the possibility of punitive damages.

**2. Lansdown Case—Fourth Amendment Unlawful Seizure Claim.**

Defendants move for summary judgment on the Fourth Amendment claim arguing that the Estate's allegations do not include violation of Lansdown's Fourth Amendment rights. They argue no seizure was alleged and no seizure occurred.

The Estate disagrees. It contends it has clearly set forth the facts and alleged that Lansdown, a mentally ill person, was held in his home for a considerable length of time at gunpoint by the defendants until he died of smoke and soot inhalation. We agree that the Estate pled such a cause of action. However, for the reasons discussed below, we believe the claim fails.

The Fourth Amendment protects against unreasonable searches and seizures. In *United States v. Tovar–Valdivia*, 193 F.3d 1025 (8th Cir.1999), the court discussed when a seizure within the meaning of the Fourth Amendment occurs. It noted that:

> The Supreme Court has held that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave...." *United States v. Mendenhall*, 446 U.S. 544, 545, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). This circuit has stated that "[p]olice 'seize' a person by engaging in conduct that would make a reasonable person feel he was not free to leave." *Mettler v. Whitledge*, 165 F.3d 1197, 1203 (8th Cir.1999).

> Circumstances indicative of a seizure may include a " 'threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, ... or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *United States v. Galvan–Muro*, 141 F.3d 904, 906 (8th Cir.1998) (*quoting United States v. White*, 81 F.3d 775, 779 (8th Cir.1996)). In addition, when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen the court may conclude that a "seizure" has occurred. *See United States v. Roby*, 122 F.3d 1120 (8th Cir.1997).

*Tovar–Valdivia*, 193 F.3d at 1027.

Here Lansdown entered the home after observing only one law enforcement officer, Chadwick. While Chadwick went to the Lansdown residence, Chadwick made

no effort to acquire physical control over Lansdown and had at the time Lansdown entered the house made no attempt to arrest Lansdown. *Brower v. County of Inyo,* 489 U.S. 593, 596–99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (A seizure occurs when "there is a governmental termination of freedom of movement *through means intentionally applied.* . . . We think it is enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." Police effectuated roadblock designed to stop a fleeing suspect constitutes a seizure). Instead, Chadwick merely attempted to determine what Lansdown was doing.

■ There is no evidence to suggest Lansdown knew other officers responded to provide back-up or that he knew several law enforcement officers had their guns drawn and aimed at the house. Nevertheless, we will assume that a seizure within the meaning of the Fourth Amendment occurred when the officers, with guns drawn, positioned themselves at various locations around the home. Certainly if Lansdown was aware of the situation, we believe he was "seized" within the meaning of the Fourth Amendment as no reasonable person would have believed he was free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

■ In both the criminal context and in the civil context, after it is determined a seizure occurred, the question then becomes whether the seizure was supported by probable cause. *See e.g., Anaya v. Crossroads Managed Care Systems, Inc.,* 195 F.3d 584, 590 (10th Cir.1999) (The seizure of persons for detoxification is closely analogous to a criminal arrest and requires application of the probable cause standard. Arrests are appropriate only when there is probable cause to believe the arrestee is a danger to himself or others.);

*Tovar–Valdivia,* 193 F.3d at 1028 (criminal context); *Ahern v. O'Donnell,* 109 F.3d 809 (1st Cir.1997) (detention and involuntary admission of an individual thought to be mentally ill).

In *Tovar–Valdivia,* the court said:

Under the Fourth Amendment, probable cause justifies a seizure. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Probable cause for a warrantless arrest "depends . . . upon whether, at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). *See also Kuehl v. Burtis,* 173 F.3d 646 (8th Cir.1999); *United States v. Neumann,* 585 F.2d 355 (8th Cir.1978).

*Tovar–Valdivia,* 193 F.3d at 1028.

Given the peculiar facts and circumstances of this case, we believe the officers' actions were supported by probable cause. First, the clerk from the gas station positively identified the vehicle driven by Lansdown as the one involved in the "drive-off." Second, when Chadwick arrived at the Lansdown home, he observed the man, later determined to be Lansdown, physically destroying property and then setting fires around the property. Third, once Lansdown was identified, the officers were made aware of his mental illness. Fourth, given the actions of Lansdown on that day, his known mental illness, and his prior history of violence, the officers certainly entertained a reasonable belief that Lansdown posed a serious threat of harm to himself or others.

■ "The state has a legitimate interest in protecting the community from the

mentally ill and in protecting a mentally ill person from self-harm." *Pino v. Higgs,* 75 F.3d 1461, 1468 (10th Cir.1996) (Individual taken into custody for an involuntary emergency mental health evaluation). Further, the Supreme Court has recognized an exception to the probable cause requirements in emergency situations or situations involving "special needs, beyond the normal need for law enforcement." *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). Here the officers were faced with a mentally ill person who had committed a crime and who was deliberately setting fires on his property. Certainly a continuing danger was created by Lansdown's activities and the officers were faced with an emerging situation. *See e.g., United States v. Boettger,* 71 F.3d 1410, 1414 (8th Cir.1995) (Need to protect public safety by detecting a continuing danger, the apparent presence of explosive chemicals and destructive devices, meets the exigent circumstances exception to the warrant requirement).

### 3. Lansdown Case—Fourteenth Amendment Failure to Protect Claim.

Defendants contend their actions did not deprive Lansdown of his Fourteenth Amendment substantive due process rights to life and liberty. They point out that the Due Process Clause is violated only when the state fails to protect the life, liberty, or security of individual citizens in two situations: "first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992)(en banc). Defendants contend neither type of case is present here.

In *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Court held that the "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.,* 489 U.S. at 196, 109 S.Ct. 998. In the Court's view, the Due Process Clause acts as "a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.,* 489 U.S. at 195, 109 S.Ct. 998.

Two exceptions to this general rule have been recognized. The first exception is typically referred to as the "special relationship doctrine." A special relationship exists when the state assumes custody or control over a person or:

> so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits of state action set by the ... Due Process Clause. The affirmative duty arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*DeShaney,* 489 U.S. at 200, 109 S.Ct. 998.

The second exception is typically referred to as the "state created danger" theory of liability. This exception comes into play when the state through its own affirmative acts created, caused, or greatly increased, the danger that harmed the individual. *See Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992)(en banc). *See also Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996)(adopting a four part test that a plaintiff must satisfy to prevail on a state created danger claim: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the

plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the harm to occur.).

As a general rule, failure to protect cases involve harm inflicted by private third parties. This case, of course, differs since Lansdown's death was caused by a danger, the fire, that he himself started. A failure to rescue claim was made in the case of *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983). There, a police officer came upon a vehicle accident approximately two minutes after it occurred but made no attempt to determine if the vehicle was occupied.

The officer called the fire department and then returned to the road to direct traffic away from the scene. Thirty-nine minutes later the firefighters discovered there were people in the car. No attempt was made to rescue or assist the people. Instead, an ambulance was called which arrived six minutes later. The female passenger was alive and was taken to the hospital where she and her fetus were later pronounced dead, The firemen and the ambulance paramedics thought the male passenger was dead. He was not removed from the vehicle until some time later when he was pulled from the vehicle by the tow truck driver and pronounced dead by the coroner.

The Seventh Circuit held there was no liability where state officers did not create but merely failed to avert danger by not promptly rescuing victims from a burning car. In so holding, the court noted that § 1983 "did not make every tort committed under color of state law actionable in federal court." *Jackson*, 715 F.2d at 1205 (citation omitted).

In *Ross v. United States*, 910 F.2d 1422 (7th Cir.1990), the Seventh Circuit was again faced with a failure to rescue case.

However, that case involved application of a policy adopted by the county and its sheriff which on the peculiar facts of that case resulted in what the court described as a "stunning abuse of governmental power." *Id.* at 1424. The policy at issue "directed all members of the sheriff's department to prevent any civilian from attempting to rescue a person in danger of drowning in the lake." *Id.* at 1425. The "policy contemplated that only divers from the city of Waukegan Fire Department could carry out such a rescue." *Id.*

The facts of that case are tragic. On August 11, 1985, a twelve-year old boy, William Ross, who had been walking on a breakwater, fell into Lake Michigan and sank. *Id.* at 1424. A friend immediately ran for help. The call for help was promptly responded to by on-duty Waukegan emergency personnel. *Id.* "Within ten minutes of William's entry into the water, two lifeguards, two firefighters, and one police officer were on the scene with equipment to effect a rescue. In addition, two nearby scuba-diving civilians offered the assistance of themselves, their boat, and their equipment." *Id.*

Before a rescue attempt could be made, a Lake County Deputy Sheriff, Gordon Johnson, arrived by boat. With the "policy in mind, Deputy Johnson ordered all of the persons then on the scene to cease their rescue efforts." *Id.* at 1425. When the civilian scuba divers stated they would attempt the rescue on their own, Johnson told them he would arrest them and would also position his boat in such a manner as to prevent the rescue efforts. *Id.* A member of the Waukegan police force agreed that the county had authority over the scene and told his fellow city employees to "heed Johnson's instructions." *Id.*

Twenty minutes after the initial rescuers arrived at the scene and thirty minutes after William had fallen into the water "the

officially authorized divers finally retrieved William's body. Although William showed clinical signs of life after being pulled from the water, he was declared dead the following morning." *Id.* at 1425.

The Seventh Circuit began with the assumption that "William would have survived had Deputy Johnson not stopped the initial rescuers." *Id.* at 1425. The court pointed out that the government's mere "failure to provide essential services does not violate the Constitution." *Id.* at 1428.

However, it then said that this was not a case where the government failed to provide services that would have saved a person from injury. *Id.* at 1431. Rather, it noted:

> [t]he plaintiff complains of a much different type of constitutional wrong. The plaintiff does not allege that the county had a policy of refusing to supply rescue services. Rather, the wrong suffered by the plaintiff and her decedent is the county's forced imposition of services that William did not want or need; the plaintiff alleges that the county had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative.

> \* \* \* \* \* \*

> The plaintiff alleges that Lake County had a policy of cutting off private aid to drowning victims, even where the county's replacement protection would not effect a rescue. Because the county's policy led to the deprivation of William's constitutionally protected right to life, the plaintiff's claim is cognizable under section 1983.

*Id.*

In the case of *Armijo v. Wagon Mound,* 159 F.3d 1253 (10th Cir.1998), the argument was made that the state created danger exception applied and rendered school officials liable for failure to protect Armijo from his self-inflicted death. Armijo was a sixteen-year-old special education student at Wagon Mound. *Id.* at 1256. Earlier in the year he had made comments to school employees such as "maybe I'd be better off dead" and "I'm just going to shoot myself." *Id.* The individuals to whom he made these comments knew Armijo had access to firearms. *Id.*

On December 1, 1994, the principal, Mary Schutz, "verbally reprimanded Armijo for harassing an elementary student." *Id.* at 1256. Armijo then threatened to harm the teacher who had reported him, the teacher's son, and the teacher's car. *Id.* at 1256–57. Schutz suspended Armijo on an emergency basis and instructed the school counselor, Tom Herrera, to drive Armijo home. *Id.* at 1257. Schutz then contacted the police instructing them to detain Armijo if he was seen returning to the school. *Id.*

Schutz did not follow the school disciplinary policy in sending Armijo home. *Id.* at 1257. The school policy provided that students placed on out-of-school suspension should remain in school if his or her parents would not be home. *Id.* Schutz did not inform Armijo's parents about the suspension and did not instruct Herrera to notify the parents. *Id.*

According to Herrera, Armijo seemed "very angry" on the ride to his house. *Id.* at 1257. Herrera dropped Armijo at the house and drove away. *Id.* When Armijo's parents returned home they found Armijo in their bedroom dead of a self-inflicted gunshot wound to the chest. *Id.*

Suit was brought contending the Due Process Clause of the Fourteenth Amendment imposed upon the school officials a duty to protect Armijo from his self-inflicted death. The Tenth Circuit found no custodial relationship sufficient to assert a failure to protect claim. It noted that even if such a custodial relationship existed, it "ended once Armijo exited the car and ran to his house because at that point he was

no longer under any involuntary restraint by a school official." *Id.* at 1261.

In determining whether the school officials created a special danger for Armijo, the court required the plaintiff to demonstrate that: (1) plaintiff was a member of a limited and specifically definable group; (2) defendants' conduct put plaintiff at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) defendants acted recklessly in conscious disregard of that risk; (5) such conduct, when viewed in total, is conscience shocking; and (6) the charged individual defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way. *Id.* at 1262–63.

It noted the:

key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur.

*Armijo,* 159 F.3d at 1263 (*quoting Johnson v. Dallas Ind. School Dist.,* 38 F.3d 198, 201 (5th Cir.1994)(internal citations and quotations omitted)).

The court concluded the record contained sufficient information to raise factual inferences that could satisfy the state created danger test. *Id.* at 1264. Among other things, it noted that the defendants' conduct had increased the risk of harm to Armijo. *Id.*

In the present case, the Estate concedes, as it must, that Lansdown himself set the fire. The Estate nevertheless contends it has a viable failure to protect claim either because Lansdown was seized and therefore in state custody or because the state, knowing of the danger to Lansdown, took steps to prevent his rescue or failed to allow his rescue. The Estate contends defendants' actions exhibited deliberate indifference to Lansdown's serious medical needs. Furthermore, the Estate contends the foreseeable result of the delay in necessary medical or rescue services was Lansdown's death.

The Estate asks the court to consider the following: (1) Lansdown had set a fire at his parents' house earlier that day and did not die; (2) he did not enter the house until confronted by Chadwick; (3) the defendants "prevented" Lansdown's neighbor and the firefighters from attempting a rescue; (4) the defendants held Lansdown at gunpoint; (5) defendants' attitude is accurately described by a deputy's statement to a firefighter, "Let the f—ker die!" and (6) Lansdown died in a room where there was no fire and he was visible through an open glass while he laid face down on a bed.

■ While the Estate's argument has some initial appeal, we find no viable failure to protect claim. Lansdown was wholly responsible for the situation that created the danger to his life. He stole gasoline, fled to his home, and set the fire that ultimately took his life. After he started the fire, Lansdown, who at least initially was not physically incapacitated, remained in the house making no attempt to leave the residence. The bedroom in which he was found had not burned and there was an available means of exit, *i.e.,* the window.

While "[i]t is not clear, under *DeShaney,* how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect." *Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990). We find that the defendants'

actions in this case do not reach the point that such a duty exists. As the Eighth Circuit recently had cause to note:

> The line between action and inaction has been important in the law for centuries, but it has proven to be an elusive and thin one; so it is perhaps not surprising that cases on either side of that line will be so close factually that drawing a legal distinction between them will often seem hard to justify. But we see the distinction nevertheless. While the state did do something here, or at least in the present procedural posture we assume that it did, in the peculiar circumstances of this case the state's act is the same as if it had done nothing. The distinction is one, moreover, that we think *DeShaney* requires us to draw.

*S.S. v. McMullen*, 225 F.3d 960, 963 (8th Cir.2000).

■■■ Admittedly there was some delay in the firefighting efforts caused by the defendants' activities. However, the delay was not lengthy, only a matter of minutes before the firefighters were allowed to begin fighting the fire, nor unreasonable given the emerging situation and the officers' need to ensure the safety of themselves and others. With respect to rescue efforts, Harris was told not to attempt a rescue by Chadwick and one firefighter, Weindruch, was told to leave the crime scene. The remaining firefighters merely testified that the deputies assumed control of the scene and were treating it as a crime scene. This behavior coupled with the fact that several deputies had weapons, the altercations regarding the crime scene tape, and the alleged hostile manner the deputies displayed toward the firefighters, discouraged the firefighters. This perceived discouragement is not the type of affirmative conduct required by *DeShaney* and its progeny.

Having reached this conclusion we feel compelled to say we are not without sympathy for Lansdown and those surviving him. The situation was extremely unfortunate and certain of the defendants' actions indicate carelessness, incompetence, and an extreme lack of professionalism that one would not expect to see exhibited by those empowered to serve and protect. In particular, the court finds appalling the altercation (or "turf" war) that occurred between the defendants and the firefighters and the inexcusable statement attributed to one or more of the officers upon observing Lansdown's body through the window.

Obviously such conduct not only ill serves the community but is also detrimental to the entities for whom the parties involved work. Despite these unfortunate circumstances, we find any delay caused in firefighting or rescue efforts to largely be the result of the defendants efforts' to respond in a safe manner to a rapidly evolving situation. One must keep in mind that only between thirty and forty minutes elapsed between the initial call for backup and firefighters and the discovery of Lansdown's body.

As the Seventh Circuit in *Jackson* stated:

> There is no reason for federal judicial intervention in a case like this. In some situations the incentives of state and local officials to provide effective and evenhanded aid and protection to their citizens may be distorted by politics or prejudice; but rescuing people from burning cars [or houses] is not one of them. If local government does a bad job of providing police and fire protection, political retribution will come swift and sure.

*Jackson*, 715 F.2d at 1205.

**4. Lansdown Case—Supervisory Liability Claim.**

As the court has concluded there is no underlying constitutional violation, the

Estate's claims against Sheriff Garrison also fail. Even if one or more of the constitutional claims had survived summary judgment, we would nevertheless grant Garrison's motion for judgment on the supervisory liability claim.

■ A supervisor may not be held liable for a section 1983 violation on the basis of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, there are circumstances which render a supervisor liable under § 1983 for the unconstitutional conduct of his subordinates. A supervisor may be held liable if he directly participated in the constitutional violation, *see Webster v. Gibson,* 913 F.2d 510, 514 (8th Cir.1990), or he may be held liable when he fails or refuses to intervene when a constitutional violation takes place in his presence. *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986); *Putman v. Gerloff,* 639 F.2d 415, 423 (8th Cir.1981).

■ Additionally, a supervisor may be held liable if his failure to train or supervise the offending actor caused the deprivation. *Tilson v. Forrest City Police Department,* 28 F.3d 802, 806 (8th Cir. 1994). "The standard of liability for a failure to train police officers is deliberate indifference." *Id.* at 807 (citations omitted). "The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" *Id.* (citation omitted). Finally, a supervisory official may be liable if he created a policy or custom under which the unconstitutional practice occurred. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

■ In this case, Garrison arrived on the scene just shortly before Lansdown's body was discovered. There has been no showing he was involved in any way in the delay in allowing the firefighters to work or in any delay in rescue efforts; nor, has there been any showing that the alleged seizure of Lansdown or any delay in rescue efforts were the result of any failure to train or supervise, or that it was the result of a policy or custom. Therefore, this portion of the defendants' summary judgment motion will be granted.

**5. Lansdown Case—Government Liability Claims.**

■ We find the Baxter County and Gassville are entitled to judgment as a matter of law. First, we have found no constitutional violations and therefore the governmental entities cannot be held liable. *See Olinger v. Larson,* 134 F.3d 1362, 1367 (8th Cir.1998)(*quoting Abbott v. City of Crocker,* 30 F.3d 994, 998 (8th Cir. 1994))("The City cannot be liable ... whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim."). Second, even if there were constitutional violations, the Estate has failed to create a genuine issue of material fact with respect to the governmental entities' liability for the acts of their police officers.

■ Respondeat superior is not a permissible theory for holding a governmental entity liable for the unconstitutional acts of its employees. *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, the governmental entity is liable under section 1983 when "a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" can be causally related to the allegedly unconstitutional conduct of its employees. *Id.* Liability may be based on "constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* at 690–91, 98

S.Ct. 2018. *See Ryan v. Board of Police Commissioners of the City of St. Louis,* 96 F.3d 1076, 1084 (8th Cir.1996).

In *Ware v. Jackson County, Mo.,* 150 F.3d 873 (8th Cir.1998) the Eighth Circuit stated that:

> "Official policy involves 'a deliberate choice to follow a course of action * * * made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy." *Jane Doe A,* 901 F.2d at 645. Alternatively, "custom or usage" is demonstrated by:
>
> > (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> >
> > (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> >
> > (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware,* 150 F.3d at 880 (citations omitted).

"[I]naction or laxness can constitute government custom if it is permanent and well settled." *Tilson v. Forrest City Police Dept.,* 28 F.3d 802, 807 (8th Cir.1994) (citation omitted). "Such a government custom of laxness or inaction must be the moving force behind the constitutional violation." *Id.* "To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Andrews v. Fowler,* 98 F.3d 1069, 1075 (8th Cir.1996).

A governmental body may also be held accountable based on a failure to train and supervise adequately under certain circumstances. *City of Canton v. Harris,*

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *Andrews* the Eighth Circuit summarized the circumstances under which a governmental entity can be held liable under § 1983 for its hiring and training practices. The court stated:

> A city also may be liable for deficient policies regarding hiring and training police officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality; and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury. It is necessary to show "that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." In other words, the plaintiff must demonstrate that the city "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights."

*Andrews,* 98 F.3d at 1076 (citations omitted).

In this case, the Estate has not alleged the existence of any basis on which Baxter County or Gassville can be held liable. No information has been provided suggesting that either governmental entity has a policy or practice of wrongfully detaining citizens or interfering with the provision of emergency services or of inadequate hiring, training, or supervision of its police officers. The court will grant the defendants' motion for summary judgment on this claim.

**6. Lansdown Case—State Law Claims.**

Defendants have also moved for summary judgment on the Estate's state law claims. However as the court has granted summary judgment in their favor on the only federal law claims, we decline to retain jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3).

**7. Urban Case—Fourth Amendment Claims.**

Andy Urban and John Urban contend they were unconstitutionally seized at the scene. The Urbans have not named as defendants the individual officers involved in the alleged unlawful seizures. Instead, the Urbans have named as defendants only Baxter County and Charlie Garrison. To establish liability they must therefore prove they were unconstitutionally seized by officers at the scene pursuant to an unconstitutional policy or custom or that some other basis of supervisory or governmental liability exists.

■■■ The Fourth Amendment prevents police from seizing a person without a reasonable suspicion of criminal activity. *See United States v. Hathcock,* 103 F.3d 715, 718 (8th Cir.1997). As we noted above, "[c]ircumstances that might indicate . . . a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the . . . citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Id.* at 718–19 (*quoting United States v. White,* 81 F.3d 775, 779 (8th Cir.1996)).

In this case, Orsborn grabbed Andy but Andy did not submit to the physical force and Andy continued on his way. Defendants predicate their argument on Andy's having gotten away. Relying on *California v. Hodari D,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), defendants contend an attempted seizure does not constitute a seizure.

Defendants' argument fails because they either misinterpret *Hodari D* or overstate its holding. *Hodari D* does not stand for the proposition that a physical touching of an individual by a law enforcement officer does not constitute a seizure within the meaning of the Fourth Amendment unless that physical touching results in a stop.

Under *Hodari D,* "a seizure occurs when either the citizen submits to an assertion of authority or physical force is applied, regardless of whether the citizen yields to that force." *Ludwig v. Anderson,* 54 F.3d 465, 471 (8th Cir.1995)(emphasis added). A seizure is " 'effected by the slightest application of physical force' despite later escape." *Ludwig,* 54 F.3d at 471 (*quoting Hodari D.,* 499 U.S. at 625, 111 S.Ct. at 1550). *See also Schulz v. Long,* 44 F.3d 643, 647 (8th Cir.1995)("A 'seizure' occurs only when a citizen is physically touched by law enforcement officers or when he otherwise submits to a show of authority by the officers.").

■■■ As Orsborn physically touched Andy, a seizure within the meaning of the Fourth Amendment occurred. With respect to John, although he was physically touched, the touch was purely accidental. He was struck while attempting to break up the altercation between the deputies and Olney. We do not believe the accidental application of physical force constitutes a seizure. Nevertheless, for purposes of this motion, we will assume that a seizure occurred.

Andy contends excessive force was used against him when someone, apparently Orsborn, grabbed him and yelled at him. He received no physical injury as a result of the incident. John contends excessive force was used against him when he was struck in the rib area while trying to break

up the altercation between Olney and Hopman. As a result of the blow, John Urban sought medical attention and had some swelling that lasted for several weeks.

■ In *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court established that excessive force claims arising in the context of an arrest are "most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures of the person." Although there can be no question that the Fourth Amendment prohibits unreasonable seizures of the person, it is also well established that "not every push or shove violates the Fourth Amendment." *Guite*, 147 F.3d at 750 (citation omitted).

In *Lawson v. Hulm*, 223 F.3d 831 (8th Cir.2000), the Eighth Circuit stated:

The applicable test is "whether the force used to effect a particular seizure is 'reasonable'." In the context of a claim of excessive force, the "reasonableness" inquiry must be an objective one in that the court must only evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." It is also important to recognize that:

The " 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

the amount of force that is necessary in a particular situation."

*Lawson*, 223 F.3d 831, 834.

The Urbans' unlawful arrest and excessive force claims fail. As discussed above in some detail, in a § 1983 action, a municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality or from the municipality's failure to train.

No claim is made that Garrison participated in the alleged seizures or in the use of excessive force. It is undisputed that Garrison's only involvement occurred when he was summoned because of the altercation between Hopman and Olney. At this point, the incident with Andy had already transpired. Similarly, the blow to John's rib area had already occurred and he was standing near the fire truck.

■ The Urbans complaints can be characterized and analyzed as failure to train claims. Specifically, they contend Garrison failed to adequately train his officers in the following respects: (1) the relationship between the deputies and other emergency personnel such as firefighters; (2) crisis intervention techniques; (3) dealing with the mentally ill; and (4) when crime scene tape should be utilized. See *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir.1998) (alleged failure of county to have adequate suicide prevention policies in place appropriately analyzed under failure to train standard set forth in *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). A municipality may be liable for failure to train its employees when that failure can be shown to be deliberate indifference to the rights of others. *See Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

■ The Urbans have failed to present any evidence of a policy or custom on which to predicate municipal liability.

There has been no showing of a failure to remedy a known pattern of unconstitutional acts. There has been no showing of deliberate indifference on Garrison's part or of his tacit authorization of the offensive acts. In sum, the facts of this case fall short of establishing a basis of supervisory or municipality liability.

### 8. Urban Case—State Law Claims.

Defendants have also moved for summary judgment on the state law claims. However as the court has granted summary judgment in their favor on the only federal law claims, we decline to retain jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3).

### Conclusion.

For the reasons stated, the defendants' motions for summary judgment will be granted. A separate order in accordance herewith will be entered.

### ORDER

On this 5th day of October, 2000, upon consideration of the defendants' motions for summary judgment, the court finds for the reasons stated in a memorandum opinion of even date that said motions should be and hereby are granted. Accordingly, these consolidated actions are dismissed.

IT IS SO ORDERED.